## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 3:18-cr-00272 (JAM) |
| DREW RANKIN *et al.*, Defendants. | |

## OMNIBUS RULING RE DEFENDANTS' MOTIONS
## TO DISMISS THE INDICTMENT AND FOR OTHER RELIEF

A federal grand jury has returned an indictment charging the five defendants in this case with conspiring to and misappropriating funds for personal purposes. The five defendants were officers or directors of the Connecticut Municipal Electric Energy Cooperative (CMEEC), a public corporation created to provide low-cost electric power for certain member towns. The indictment alleges that the five defendants misused funds of CMEEC and the member towns for trips to the Kentucky Derby and to a luxury golf resort in West Virginia.

Defendants now move to dismiss the indictment and for other relief. They principally argue that the trips at issue were lawful "corporate retreats" and that the Government has overreached by criminalizing conduct that is allowed under state law. They also accuse the Government of a wide range of misconduct during the investigation of the case. One of the defendants moves for a severance, and all of the defendants seek bills of particulars.

I will mostly deny defendants' motions. I conclude that the indictment on its face validly alleges that the five defendants conspired to and misappropriated funds for personal purposes, notwithstanding their fact-based arguments that they acted for valid corporate purposes. I also conclude that there is no merit to defendants' claims that the indictment should be dismissed due to any misconduct by the Government. Lastly, I conclude there are no grounds for severance or for the grant of a bill of particulars.

**BACKGROUND**

The indictment alleges the following facts. CMEEC was "a cooperative public corporation created under the laws of the State of Connecticut to permit municipal electric utilities in Connecticut to join together for the purpose of furnishing efficient, low cost and reliable electric power in the municipalities' areas of operation." Doc. #1 at 1 (¶ 1). "CMEEC provided wholesale electric power to the Member Towns, who, in turn, provided electricity to residential and commercial ratepayers in their respective towns through each CMEEC Member's municipal utility." *Id.* at 1-2 (¶ 1). "CMEEC's purpose was to allow the Member Towns to provide electricity at a cheaper cost to their ratepayers than if the Member Towns were purchasing wholesale electric power on their own." *Id.* at 2 (¶ 1).

CMEEC's various "members" included several towns and taxing districts in Connecticut. *Id.* at 1 (¶ 1). Each of these "member towns" were "owners" of CMEEC, and each "executed an agreement through its respective municipal electric utility outlining the terms and conditions under which the CMEEC Members participated together in CMEEC." *Id.* at 2 (¶ 2).

CMEEC "was managed in its day-to-day activities" by a board of directors "made up of representatives from each Member Town." *Id.* at 3 (¶ 5). CMEEC's bylaws specified that CMEEC's chief executive officer was responsible for the preparation each year of a general administrative budget that would include all necessary expenses, and the board of directors was required to vote on CMEEC's budget approvals and revisions. *Id.* at 4 (¶ 7).

According to CMEEC's membership agreement, "all revenues less incurred expenses received by CMEEC" were designated as "CMEEC Margin." *Id.* at 4 (¶ 8). The CMEEC margin was required to be allocated and/or disbursed each month to each of the member towns to help keep their electricity costs stable for ratepayers. *Ibid.*

The five defendants in this case are:

- Drew Rankin, CMEEC's chief executive officer;
- James Sullivan, CMEEC's chairperson of the board of directors and a board representative from one of the member towns (the City of Norwich);
- John Bilda, a board representative from the City of Norwich;
- Edward DeMuzzio, CMEEC's board secretary and a board representative from another member town (the City of Groton); and
- Edward Pryor, CMEEC's chief financial officer.

*Id.* at 4-5 (¶¶ 9-14).

According to the indictment, the five defendants joined in a criminal conspiracy from 2014 to 2017 "to conduct the business and affairs of CMEEC for their personal, pecuniary and financial benefit, and for the personal, pecuniary and financial benefit of their family members, friends, and associates." *Id.* at 6-7 (¶¶ 16-17). Defendants allegedly "planned, organized and directed lavish trips outside of the State of Connecticut including trips to the Kentucky Derby in Louisville, Kentucky, and to a luxury golf resort in West Virginia," and "[t]hese trips did not relate to CMEEC business, CMEEC Member business, and the furnishing of efficient, low-cost and reliable electric power to the Member Towns and their ratepayers." *Id.* at 7 (¶ 19).

The indictment goes on to list various aspects of defendants' conduct that were additional "parts" of this conspiracy:

- *Source of funds for the trips*—that the defendants "paid for the trips with CMEEC funds and CMEEC Member funds," *id.* at 7 (¶ 20);

- *Lack of required approval by and disclosures of trip costs to board of directors*—that defendants "did not seek the approval of the CMEEC Board of Directors for these trips and did not include the costs for the trips as budget expenses in the annual general administrative budgets proposed to and approved by the CMEEC Board of Directors," *id.* at 7-8 (¶ 21);

- *Misappropriation of funds for trips from CMEEC margin account*—that defendants "directed that the funds used in part and in whole to pay for the trips come from the CMEEC Margin account, in violation of the CMEEC Membership Agreement, without a

vote of the CMEEC Board of Directors and without the written consent of the Member Towns as required by the Membership Agreement," *id.* at 8 (¶ 22);

- *Misleading description of trip expenses*—that defendants "directed that the funds used in part and in whole to pay for the trips be designated as 'board expenses' and 'delegation related expenses' in reports concerning the CMEEC Margin account," *ibid.* (¶ 23);

- *Lack of disclosure of trips to non-participating CMEEC employees*—that defendants "did not disclose to CMEEC employees, including senior-level employees, the fact of the trips, and encouraged those invited to the trips not to discuss the trips with non-attendees," *ibid.* (¶ 24); and

- *False statements about trips*—that "when the fact of the trips became public knowledge, [some of the defendants] made false statements about the trips to representatives of Member Towns and to the press, including misleading statements about the purpose of the trips, the identities of those attending the trips, and the funds used to pay for the trips," *ibid.* (¶ 25).

The indictment then alleges dozens of overt acts in furtherance of the conspiracy. *Id.* at 9-17 (¶¶ 26-61). These allegations focus on four different trips from 2015 to 2016—two to the Kentucky Derby and two to a luxury golf resort in West Virginia as described below.

### Kentucky Derby trip—April/May 2015

The first trip was to the Kentucky Derby for several days in late April and early May 2015. The arrangements for this trip began in June 2014 when defendant Rankin (who was CMEEC's chief executive officer) executed a purchase order for more than $200,000 to pay for the trip without identifying the trip expenses in any budget presented to the CMEEC board of directors. *Id.* at 9 (¶ 27). Defendant Pryor (who was CMEEC's chief financial officer) directed that a new "contra-margin" account be created for the costs of the Kentucky Derby trips to come from the CMEEC margin account, allegedly in violation of the CMEEC membership agreement and without a vote of the CMEEC board of directors or consent of the member towns. *Ibid.* (¶ 28).

About 30 people were invited to take part in the 2015 Kentucky Derby trip, including all of the defendants except DeMuzzio, and guests including certain CMEEC board members, employees, friends, and associates. *Id*. at 9-10 (¶ 31). Among the invitees were defendant Sullivan's brother, sister-in-law, and his minor son. *Ibid.* The trip costs included a charter plane from Connecticut to Kentucky, event tickets, hotel rooms, food, and gift bags. *Id.* at 9 (¶ 27), 11 (¶ 35).

In a pamphlet prepared for the attendees, Rankin described the trip as a "2015 Strategic Retreat: Members and Guests Appreciation Celebration," adding "[a]re you ready for some genuine Kentucky Experience and Derby Fun?" *Id.* at 10 (¶ 32). The pamphlet described the trip as dedicated to "tak[ing] a few moments to celebrate and honor you as dedicated and awesome Board Members and your Strategic Guests/Partners." *Ibid*. The total cost for this trip was about $294,917, all paid for "with Member Towns' funds from the CMEEC Margin account." *Id*. at 11 (¶ 35).

### *West Virginia golf trip—August 2015*

The second trip was to a luxury golf resort in West Virginia in August 2015 about three months after the Kentucky Derby trip. *Id*. at 11-12 (¶¶ 39-43). This trip included only the defendants Rankin, Sullivan, Bilda, and DeMuzzio. Before the trip, Rankin emailed Sullivan, Bilda, and DeMuzzio describing the trip as one to "evaluate the location" for another strategic retreat. *Id*. at 11-12 (¶ 39). Sullivan (who was CMEEC's board chairman) sent a reply stating, "Is your name 'I deserve a raise?'" *Id.* at 12 (¶ 42). Rankin also sent the group an email with a description of the cottage at the golf resort that he had reserved and a schedule of the golf courses they would visit. *Id.* at 12 (¶ 41). The total cost of this second trip was $21,447, and

invoices approved by Rankin for the trip noted that it was in connection with the board of directors' "compensation committee." *Id*. at 12 (¶ 43).

### *West Virginia golf trip—October 2015*

The third trip was a return to the same luxury golf resort in West Virginia in October 2015 with a larger group. Rankin sent an email to representatives of CMEEC's board of directors inviting them to a "Member Delegation Strategic Retreat" at the golf resort, stating that "[t]he retreat is planned off site and out of state to enable full focus on strategic issues, celebratory review of results, and general social/team building." *Id.* at 12 (¶ 44). The total cost of this trip was approximately $112,443.98 and was "paid for with Member Towns' funds in the CMEEC Margin account." *Ibid.* (¶ 47). Among the trip expenses were $2,264.57 for seventeen "ladies' scarves," as well as $3,426.80 in custom golf balls and hats from an entity owned by defendant Bilda's wife. *Id*. at 13-14 (¶¶ 45, 47-49).

### *Kentucky Derby trip—May 2016*

The next trip involved a return to the Kentucky Derby in May 2016. Rankin initially approved a purchase order for this trip in May 2015, and this purchase order "was charged against the CMEEC Margin." *Id.* at 11 (¶ 37). The trip included about 40 guests, including Bilda's parents, the wife and mother-in-law of a CMEEC board member who was not attending the retreat, CMEEC vendors, a close friend of DeMuzzio's who lived in Florida, a son-in-law and daughter of a CMEEC vendor, and the mayor of one of the CMEEC member towns. *Id.* at 14 (¶ 51). Shortly before the trip, Rankin sent an email to the participants advising that "we have an excellent agenda scheduled to produce maximum fulfillment, all in expression of appreciation to each of you for helping CMEEC be successful." *Ibid.* The trip involved charter plane travel from Connecticut to Kentucky, followed by attendance at the Kentucky Derby and related events. *Id.*

at 14-15 (¶ 53). The total cost of the trip was approximately $374,169, "paid for with CMEEC and Member Towns' funds." *Ibid*.

### After the trips

Soon after the 2016 Kentucky Derby trip, Rankin executed another purchase agreement for 40 ticket packages to the Kentucky Derby in 2017, including for event tickets, hotel rooms, food, gift bags, and transport. *Id.* at 15 (¶ 54). But several months later, the news media and others made inquiries about the trips that had occurred, and Rankin and Bilda responded with inaccurate and misleading information. *Id*. at 15-17 (¶¶ 56-60). The planned 2017 trip to the Kentucky Derby did not happen, and CMEEC eventually received a refund of only about $90,000 of the $298,960 it had already paid. *Id.* at 17 (¶ 61).

### The indictment

Count One of the indictment broadly alleges that the five defendants joined in a criminal conspiracy from 2014 to 2017 to misappropriate funds that belonged to CMEEC and its member towns. *Id.* at 6 (¶ 16). The indictment alleges a conspiracy in violation of 18 U.S.C. § 371 with an objective to violate a separate federal criminal law, 18 U.S.C. § 666(a)(1)(A), that generally prohibits the knowing or intentional misappropriation of funds from agencies that receive federal funding. *Ibid.*[1] Counts Two through Four of the indictment charge all five defendants with

---

[1] The conspiracy statute, 18 U.S.C. § 371, provides in relevant part: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." The underlying statute, 18 U.S.C. § 666(a)(1)(A), provides in relevant part: "Whoever . . . being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof . . . embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that . . . is valued at $5,000 or more, and . . . is owned by, or is under the care, custody, or control of such organization, government, or agency . . . [and] that . . . organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance[, such person] shall be fined under this title, imprisoned not more than 10 years, or both." 18 U.S.C. § 666(a)(1)(A) & (b).

substantive counts of misappropriation of funds in 2014, 2015, and 2016 from a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A) and 18 U.S.C. § 2.

Section 666(a)(1)(A) by its terms applies to a wide range of acts including embezzlement, stealing, obtaining by fraud, knowing conversion, or other intentional misapplication of property. For simplicity, this ruling will refer generically to such intentional acts as "misappropriation." The indictment otherwise alleges specific threshold requisites for a violation of section 666: that defendants were "agents" of CMEEC and/or the member towns, Doc. #1 at 4-5 (¶¶ 9-14), that CMEEC, its member towns, and their respective utilities were each a "government agency," *id.* at 2 (¶ 3), and that CMEEC and members towns annually received more than $10,000 in federal funds for particular years as specified in the indictment, *id.* at 2-3 (¶ 4).

## DISCUSSION

The five defendants have each filed numerous motions and largely joined in each other's motions.[2] These motions can be grouped into the following categories: (A) motions challenging the adequacy or legal basis for the indictment, (B) motions alleging misconduct by the Government, (C) a motion for severance, and (D) motions for bills of particulars. I will consider each group of motions in turn.

### A.      *Challenges to the sufficiency of the indictment*

Defendants challenge the adequacy of the indictment on multiple grounds. Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." An indictment

---

[2] Each defendant has adopted, pursuant to Local R. Crim. P. 47(b), most the arguments and/or motions made by each other defendant. *See* Docs. #94, #101, #105, #108, #109, #110, #111. For simplicity, this ruling will generally refer to each motion as having been filed by and pressed by the "defendants" in general rather than by any particular defendant. In referring to specific arguments made in defendants' briefing, I do not include parallel citation to the briefing of the other defendants that simply adopts those arguments verbatim.

is legally sufficient and will not be dismissed if it tracks the elements of the offense and alleges facts (such as time and place) with sufficient precision to give a defendant fair notice of the charge he must defend against at trial. *See, e.g.*, *United States v. Bout*, 731 F.3d 233, 240 (2d Cir. 2013). Moreover, when an indictment alleges a conspiracy, it need not allege with technical precision all the elements essential to the commission of the crime that is the object of the conspiracy. *Ibid.* As the Second Circuit has explained, "[a]n indictment need not be perfect, and common sense and reason are more important than technicalities." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013).

Sometimes a criminal defendant may move to dismiss an indictment on grounds that the prosecution does not have enough evidence to prove its charge at trial. But this is not a proper challenge, because the federal rules do not authorize judges to engage in a pre-trial inquest to decide if the prosecution will have enough evidence to prove its case at trial. *See Costello v. United States*, 350 U.S. 359, 363-64 (1956). Instead, a judge must allow the prosecution an opportunity to marshal and present its evidence at trial; only then may a defendant challenge the sufficiency of the evidence by way of a motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29 at the close of evidence in the case. *See United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012).

In short, the validity of an indictment is tested by the adequacy of its allegations, not by whether the prosecution can ultimately prove its case. And for this reason, when a court considers a defendant's pre-trial motion to dismiss an indictment, it must be alert to arguments that may be artfully framed as if challenging the sufficiency of the indictment but that in reality invite the judge to decide if the prosecution can meet its evidentiary burden at trial. *See United States v. Triumph Capital Grp., Inc.*, 260 F. Supp. 2d 462, 465 (D. Conn. 2002).

### *1.     Awareness and approval of CMEEC board of directors*

Defendants' first challenge is premised on their assertion that CMEEC's board of directors knew of and approved the trips in question. Defendants argue that they cannot have committed a misappropriation of corporate funds if their actions were approved by the company's board of directors. Citing those portions of the indictment alleging that members of CMEEC's board of directors were invited to attend one or more of the trips at issue, they argue that "[o]ne does not engage in 'theft' by planning a corporate retreat, even if 'lavish,' if the fiduciaries of the supposed 'victim' know the corporation is paying for the retreat and those fiduciaries voluntarily attend and enjoy the retreat: year after year." Doc. #85 at 6-7 (emphasis omitted). In the alternative, defendants argue that the inclusion of the CMEEC board members and the ostensible business purpose of the trips fatally contradicts the indictment's allegations that the defendants acted with the necessary improper intent. *Ibid*.

I do not agree for several reasons. First, the indictment alleges that defendants "did not seek the approval of the CMEEC Board of Directors for these trips and did not include the costs for the trips as budget expenses in the annual general administrative budgets proposed to and approved by the CMEEC Board of Directors." Doc. #1 at 7-8 (¶ 21); *see also id.* at 8 (¶¶ 22-24) (similar allegations of lack of board vote, obfuscation of nature of trip expenses, and non-disclosure of trips to senior-level CMEEC employees). Accordingly, notwithstanding any other allegations of the indictment that defendants interpret to mean that one or more members of the board of directors were aware of the trips, the indictment sufficiently alleges that there was no seeking of corporate board approval for the trips or full disclosure to the entire board for its

approval. At the stage of a motion to dismiss an indictment, I must credit the allegations of the indictment.[3]

Second, even if I were to adopt a reading of the indictment that the board fully approved of these trips, it does not follow that the indictment would thereby fail as a matter of law to allege the crimes of conspiracy and misappropriation of funds. Indeed, if all the leaders of a company join *en masse* to loot the company for their private benefit, the fact of board approval would not mean that no crime occurred.

Defendants' argument assumes that the use of corporate or municipal funds for personal purposes is not "criminal" if known to or approved by corporate higher-ups. But that is not the law. *See Arthur Lipper Corp. v. S.E.C.*, 547 F.2d 171, 179 (2d Cir. 1976) (Friendly, J.) ("[I]t is not within the competence of a board of directors of an investment company to sanction the perpetration of a fraud by the manager"); *United States v. Bailey*, 859 F.2d 1265, 1279 (7th Cir. 1988) (rejecting "the broad principle that consent by the Board of Directors is an absolute defense to misapplication" and noting that "if intent to defraud or injure exists, the Board of Directors' approval is irrelevant").

To the extent that the indictment alleges that defendants failed to seek formal approval for trips from the board of directors and to fully disclose trip expenses in budgets to the board of directors, it supports the Government's overarching charge that the defendants acted with the knowledge and intent to establish the conspiracy and misappropriation charges. The defendants

---

[3] In a similar vein, defendants also point to disagreements with the indictment's description of the use of the CMEEC margin account and the rules pertaining to the use of the margin account, *see* Doc. #90-1 at 3 (Bilda motion to dismiss); Doc. #114 at 28 n.7 (Government reply, discussing disagreements); Doc. #122 at 8 (Rankin reply). For present purposes, it is sufficient that the indictment states that the CMEEC margin account was employed for at least some of the challenged transactions, Doc. #1 at 9 (¶ 30), and could not be so employed without the express approval of the member towns themselves, *id*. at 8 (¶ 22), consent that was never given, *id*. at 9 (¶ 28). Adjudicating the parties' claims about the use of and rules for the CMEEC margin would require me to make factual determinations that I cannot permissibly make at this stage of the case.

of course will be free at trial to argue the contrary: that the board of directors was fully "in the loop," and that this suggests that defendants did not act merely for personal purposes or with criminal knowledge or intent.

At the end of the day, the involvement or approval of the board of directors is a *fact* issue that goes to the defendants' state of mind and even to whether there was a misappropriation at all if there was a valid corporate purpose for the trips. It is not a *legal* issue that goes to the inherent legality of defendants' conduct and consequently to the validity of the indictment. Accordingly, I will deny defendants' motion to dismiss the indictment insofar as defendants argue that their actions were known to and approved by the CMEEC board of directors.

Rankin argues in the alternative that he had authority in his position as chief executive officer to plan and implement the trips *without* approval of the board of directors. Doc. #85 at 14-15. If so, this only serves to undermine his argument that his actions were fully authorized by the board of directors. In any event, to the extent that Rankin had authority under corporate rules to act on behalf of CMEEC without the knowledge or approval of the board of directors, this does not mean that any actions he took for personal purposes were necessarily lawful under federal law.

### 2. State law defenses

Defendants next argue that the indictment must be dismissed in light of the broad powers granted to CMEEC by the state law governing municipal energy cooperatives and in light of the broad discretion afforded corporate officials under state law by the "business judgment" rule. Before I discuss these arguments, it is worth noting the limited relevance of state law to an evaluation of the adequacy of a federal indictment. That is because federal law preempts contrary state law. *See* U.S. Const. art. VI. As a separate and supreme sovereign, the federal government may criminalize conduct that is wholly lawful under state law. *See United States v. Canori*, 737

F.3d 181, 184 (2d Cir. 2013) (federal prosecution for marijuana notwithstanding legality of marijuana under state law); *cf. Gamble v. United States*, 139 S. Ct. 1960 (2019) (re-affirming the dual sovereignty doctrine and rejecting argument that the Double Jeopardy Clause prohibits the federal government from prosecuting a defendant for the same conduct for which he has been prosecuted under state law).

Accordingly, to the extent that defendants would rely on state law to challenge the adequacy of a federal indictment, they cannot claim that because state law authorizes or allows certain conduct, they may not be subject to prosecution for this conduct under federal law. Instead, to the extent that defendants would rely on state law at all in a federal criminal case, they must show how in context the operation of state law negates a necessary element of the federal law crime, such as the elements of knowledge, intent, or misappropriation. And when relying on state law at the pre-trial stage of a motion to dismiss a federal indictment, they must show that state law altogether dispels any legal basis for an indictment rather than merely tending to weaken the force of anticipated evidence that the Government will introduce at trial.[4]

In light of this background, I will turn to defendants' state law arguments.

### 3.     *CMEEC's authorizing statute*

Defendants cite a provision of CMEEC's authorizing statute that grants it "any and all powers that might be exercised by a natural person or a private corporation in connection with similar property and affairs." Conn. Gen. Stat. § 7-233e(b)(29). Defendants argue that the

---

[4] Defendants misplace their reliance on *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007), because it does not stand for the blanket proposition that compliance with state laws immunizes one from federal prosecution under section 666. In fact, it stands for the reverse. *See id.* at 881 ("a violation of regulations and perhaps of some [state] statutes has occurred, but is the error a crime?"). *Thompson* is also distinguishable on its own terms; there were no allegations of the misappropriation of organizational funds for personal use, but rather the employment of improper political considerations in the allocation of organizational funds for their stated purposes—ironically, spending of an official travel budget. In other words, *Thompson* lacked what this case has: any suggestion of personal benefit or conversion of funds for improper purposes.

indictment fails to allege a misappropriation of funds because this subsection and others like it authorized CMEEC to spend money on corporate retreats just like any private corporation might do.

But defendants overlook language from the same statute that undermines their comparison of CMEEC to a private company. Unlike an ordinary private company, which may have "the purpose of engaging in any lawful business," Conn. Gen. Stat. § 33-645(a), Connecticut law expressly restricts the exercise of powers by CMEEC and other municipal electrical cooperatives to those "in furtherance of its purpose of providing facilities for the generation and transmission of electric power," Conn. Gen. Stat. § 7-233e(b).[5]

Under Connecticut law, "[c]orporations organized for special purposes are limited in their powers to the purposes for which they are organized." *Blue Cross & Blue Shield of Connecticut, Inc. v. Mike*, 184 Conn. 352, 355 (1981). It follows that each and every one of CMEEC's statutorily enumerated powers—including the specific provision, § 7-233e(b)(29), on which defendants rely—is conditioned and limited by the general requirement of § 7-233e(b) that the exercise of CMEEC's powers be in furtherance of this limited purpose.

What is more, the particular subsection of the statute on which defendants rely contains additional limiting language. This subsection allows CMEEC to exercise "all powers . . . which may be reasonably necessary or appropriate for or incidental to the effectuation of its authorized purposes."[6] As noted above, these "authorized purposes" for which any exercise of power must

---

[5] Conn. Gen. Stat. § 7-233e(b) provides in relevant part: "A municipal electric energy cooperative created in the manner provided in this chapter shall constitute a public body corporate and politic, and in furtherance of its purpose of providing facilities for the generation and transmission of electric power such municipal electric energy cooperative shall be deemed to be exercising an essential governmental function and shall have the following powers, to wit: [followed by a lengthy listing of 29 enumerated powers]."

[6] Conn. Gen. Stat. § 7-233e(b)(29) provides in full: "To exercise all other powers not inconsistent with the state Constitution or the United States Constitution, which may be reasonably necessary or appropriate for or incidental to the effectuation of its authorized purposes or to the exercise of any of the foregoing powers, and generally to exercise in connection with its property and affairs, and in connection with property within its control, any and all

be "reasonably necessary" are restricted "to providing facilities for the generation and transmission of electric power." In light of these express statutory limitations on CMEEC's powers, defendants have failed to show that the statute licensed CMEEC (let alone the defendants) to expend funds for corporate retreats just like any private company might do, much less that the powers given under the statute negate the adequacy of the indictment as a matter of law.[7]

In any event, even if I accepted defendants' incomplete interpretation of CMEEC's authorizing statute, it would not compel dismissal of the indictment. That is because the indictment alleges the trips were taken for reasons of personal self-interest rather than for valid corporate reasons. The indictment expressly alleges that defendants joined in a conspiracy "to conduct the business and affairs of CMEEC for their personal, pecuniary and financial benefit, and for the personal, pecuniary and financial benefit of their family members, friends, and associates." *Id.* at 6-7 (¶ 17). It further alleges that defendants "planned, organized and directed lavish trips outside of the State of Connecticut including trips to the Kentucky Derby in Louisville, Kentucky, and to a luxury golf resort in West Virginia," and that "[t]hese trips did not relate to CMEEC business, CMEEC Member business, and the furnishing of efficient, low-cost and reliable electric power to the Member Towns and their ratepayers." *Id.* at 7 (¶ 19). The allegations of the indictment could hardly be clearer that the trip expenses were not incurred for any valid corporate purpose, let alone the limited purposes CMEEC was authorized by statute to pursue.

powers that might be exercised by a natural person or a private corporation in connection with similar property and affairs."

[7] Notwithstanding defendants' arguments to the contrary, the Connecticut legislature's recent decision to add a new subsection (j) to Conn. Gen. Stat. § 7-233c that now permits strategic retreats but requires them to be held in the state (2017 Conn. Legis. Serv. P.A. 17-73 (S.B. 4)) is not relevant to this case.

Defendants also rely on another provision from CMEEC's authorizing statute which provides that a municipal electrical cooperative may "reimburse its representatives for necessary expenses incurred in the discharge of their duties," Conn. Gen. Stat. § 7-233p, as well as the analogous section in the CMEEC membership agreement providing for the reimbursement of "direct expenses incurred by Board Members in conducting CMEEC business." Doc. 91-2 at 23; *see also* Doc. #85 at 20. But defendants' reliance on these subsections simply begs the question whether the trip expenses at issue in this case were "necessary" to the discharge of defendants' corporate duties or were "incurred . . . in conducting CMEEC business."

Of course, defendants will be free at trial to argue that the trips were engaged in for valid "corporate retreat" purposes. But because I must accept the allegations as they appear in the indictment and not in light of what the defendants think the trial evidence will show, there are no grounds to conclude that the scope of corporate powers under CMEEC's authorizing statute warrants dismissal of the indictment.

### 4. *Criminal liability for "business judgment"*

Defendants next rely on the business judgment rule—a background rule of state corporate law that limits judicial review of the discretionary business judgments of corporate officers and directors. *See generally Rosenfield v. Metals Selling Corp.*, 229 Conn. 771, 785-88 (1994). But defendants overlook the limited scope of the business judgment rule and other doctrines that limit judicial review (civil or criminal) of business decisions: these doctrines of deference do not apply to corporate decisions that are infected with a personal conflict of interest. "The business judgment rule presupposes that the directors have no conflict of interest. When a shareholder attacks a transaction in which the directors have an interest other than as directors of the corporation, the directors may not escape review of the merits of the transaction." *Lewis v. S. L. & E., Inc.*, 629 F.2d 764, 769 (2d Cir. 1980).

"A director is considered 'self-interested' in a transaction where she will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally." *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016). "Whatever its merit . . . the business judgment rule extends only as far as the reasons which justify its existence. Thus, it does not apply in cases, e.g., in which the corporate decision lacks a business purpose, is tainted by a conflict of interest, is so egregious as to amount to a no-win decision, or results from an obvious and prolonged failure to exercise oversight or supervision." *Joy v. North*, 692 F.2d 880, 886 (2d Cir. 1982).

Defendants rely on *Taneja v. FamilyMeds Group Inc.*, 2009 WL 415454 (Conn. Super. Ct. 2009), which they claim "dismissed derivative shareholder claims of 'wasting corporate assets on unnecessary business trips, lavish travel accommodations and unjustified bonuses and salary increases,' because the Business Judgement Rule protects against second-guessing 'even a bad decision.'" Doc. #85 at 17 (quoting *Taneja*, 2009 WL 415454 at *9-*10). This argument misreads the *Taneja* decision. The court in *Taneja* dismissed the claim on grounds that "these allegations are not supported by specific facts," and "[t]his leaves the court to guess as to how each defendant was personally interested in each of the challenged actions." *Id.* at *7-*8. The court in *Taneja* otherwise discussed how the business judgment rule does not apply "where the director will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Id.* at *7. The *Taneja* decision therefore undermines defendants' argument that the indictment should be dismissed because of the business judgment rule.

As noted above, the indictment amply alleges that defendants acted for reasons of self-interest. Doc. #1 at 6-7 (¶¶ 17, 19). These allegations of self-interest refute any argument that the indictment should be dismissed because of the business judgment rule.

##### 5.     *Safe harbor exception*

Defendants next move to dismiss the indictment on the ground that their conduct falls within the scope of a "safe harbor exception" to 18 U.S.C. § 666. This exception provides that the statute "does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c).

Compensation and expenses are "bona fide" and made "in the usual course of business" if made without fraud or deceit and in the normal routine of a business. *See United States v. Walsh*, 156 F. Supp. 3d 374, 384-85 (E.D.N.Y. 2016); *see also* H.R. Rep. No. 797, 99th Cong., 2d Sess. 30 (1986), U.S. Code Cong. & Admin. News 1986, pp. 6138, 6153 (committee report on safe harbor section describing the safe harbor as extending to "acceptable commercial or business practice[s]"). Here, the indictment alleges that the defendants engaged in Kentucky Derby and golf outing trips for their own personal purposes not related to CMEEC business. Doc. #1 at 7 (¶ 19). That this misappropriation may have been routine is irrelevant. That the trips were undertaken for personal purposes rather than CMEEC business is enough on its face to fall outside the scope of the safe harbor exception.

To the extent that defendants rely on portions of the indictment that quote one or more defendants describing the trips as "strategic retreats" or for other business-related purposes, a fair reading of the indictment reflects that these characterizations were made as window-dressing and with awareness that there was no legitimate connection between the horse-racing and golfing ventures and CMEEC's business to efficiently furnish low-cost energy for the benefit of CMEEC's member towns.[8]

---

[8] I agree with the Government that *United States v. Rooney*, 37 F.3d 847 (2d Cir. 1994) is not relevant to the present case. In *Rooney*, a private developer was held not to have breached 18 U.S.C. § 666(a)(1)(B) because he had not breached a duty to the government. Here, the breach of duty as pled in the indictment is obvious.

"Whether wages are bona fide is ordinarily a question of fact for the jury," *United States v. George*, 841 F.3d 55, 62 (1st Cir. 2016), and the same rule applies to expenses. Accordingly, I conclude that the "safe harbor" exception is not grounds to dismiss the indictment, and I will deny the motion to dismiss the indictment on grounds of the "safe harbor" exception.

### 6.  *Due process fair notice*

Defendants next argue that the indictment violates due process because they could not have had fair notice that it would violate federal law for them to authorize or participate in the trips as alleged in the indictment. Their arguments draw on the points previously discussed relating to the alleged awareness and approval by the board of directors as well as the scope of corporate authority under state law and the business judgment rule.

The "first essential of due process of law" is that criminal law statutes "must give people of common intelligence fair notice of what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). But where, as here, a criminal statute contains a scienter requirement, a lack of fair notice claim "must be met with some measure of skepticism." *United States v. Roberts*, 363 F.3d 118, 123 (2d Cir. 2004).

Defendants argue that corporations and other organizations commonly hold "retreats" to build employee morale, and they could not have reasonably known it to be a federal crime for them to organize or take part in these retreats. The problem with this argument is that the indictment does not allege or subscribe to defendants' view that there was a valid corporate purpose for the Kentucky Derby and West Virginia golfing trips. As the Government notes, the indictment "tells a different story: that the defendants raided a public agency and public money, treating those funds as their own personal piggybanks to reward and enrich themselves, their families, and their friends." Doc. #114 at 9.

The most that can be said is that defendants at times chose to characterize the trips as business "retreats." But reasonable people do not believe that they may take any amount of travel, vacation, and gift benefits from a company so long as they dub the venture a "corporate retreat." If that were so, the defendants could use corporate funds to bankroll a year-long beach vacation in Bali, all in the alleged name of a "strategic retreat" to enhance company morale and teamwork. The indictment here does not allege that ridiculous a level of excess, but it alleges plenty of facts that—if proven—would suffice to put a reasonable person on notice that the Kentucky Derby and West Virginia golf outing trips amounted to an improper use of corporate or municipal funds for personal purposes.

Accordingly, I conclude that defendants had fair notice of the crimes alleged against them. *See United States v. Urlacher*, 979 F.2d 935, 939 (2d Cir. 1992) (upholding conviction under 18 U.S.C. § 666 from vagueness challenge when a police officer "spent police funds for unauthorized purposes [and] failed to prove that these funds were spent for legitimate police purposes"). And I will deny their motion to dismiss the indictment on due process grounds.

### 7. *Federal funds nexus*

Defendants move to dismiss the indictment on grounds that "[n]ot one penny of federal money received by CMEEC paid for any part of the challenged Board retreats." Doc. #90-1 at 2. Even if this is true, it is well-established that 18 U.S.C. § 666 does not require the Government to prove a nexus between the federal funds that have been furnished to a municipality or agency and the funds that are embezzled or misappropriated. *See Sabri v. United States*, 541 U.S. 600, 605-07 (2004).

Defendants argue that *Sabri* is distinguishable because it involved underlying conduct (bribery) that was "clearly criminal," while this case involves conduct that was otherwise authorized by state law. Doc. #90-1 at 7-11. As I have noted above, however, the allegations of

the indictment do not establish that defendants' conduct was indeed authorized by state law or otherwise inherently innocent in nature. Accordingly, I will decline to dismiss the indictment on the ground that it fails to establish a nexus between federal funds and the funds alleged to be misappropriated.

8. *Allegations of property owned by or under the care, custody, and control of CMEEC member towns*

Defendants move to dismiss the indictment to the extent that it alleges any misappropriation of property that was owned by or under the care, custody, or control of any of CMEEC's member towns, as distinct from CMEEC itself. *See* 18 U.S.C. § 666(a)(1)(A) (requiring a defendant to be an agent of an organization, government, or agency and then misappropriate "property that—(i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency"). They point to the indictment's multiple allegations that certain trip expenses were paid from CMEEC's "margin" account, and they contend that as a matter of law such funds in CMEEC's "margin" account were still owned by and under the care, custody, and control of CMEEC at the time of their alleged misappropriation, notwithstanding any intended future disbursement to the member towns. *See* Doc. #91-1.

Defendants have raised substantial doubts about whether any of the funds alleged to have been misappropriated were, at the time of their misappropriation, owned by or under the care, custody, or control of any of the CMEEC member towns. Nevertheless, the indictment expressly alleges at various points that the trip expenses were in fact paid with member town funds. Doc. #1 at 7 (¶ 20), 13 (¶¶ 47-48), 15 (¶ 53); *see also id.* at 6 (¶ 16) (alleging conspiracy to misappropriate funds "that was owned, and under the care, custody, and control of CMEEC *and the CMEEC Members*") (emphasis added). Because I must credit the indictment's factual

allegations and cannot yet be certain without engaging in a prohibited factual inquest that the defendants' position is correct or compelled as a matter of law, I decline to dismiss those allegations of the indictment alleging that any of the funds misappropriated were owned by or under the care, custody, and control of the CMEEC member towns. This ruling is without prejudice to defendants' renewal of this argument at trial.

### 9. Challenges based on defendants' status as agents of CMEEC or the member towns

In addition to the conspiracy charged in Count One of the indictment, the substantive counts of the indictment—Counts Two, Three, and Four—charge violations of 18 U.S.C. § 666(a)(1)(A) against all the defendants for each of the years 2014, 2015, and 2016 respectively. As is clear from the language of the statute, the basic elements of a violation of 18 U.S.C. § 666(a)(1)(A) are: (1) that a defendant have acted as an agent of a local government or other agency or organization; (2) that the local government or agency or organization has received in excess of $10,000 in federal funds within a one-year period; (3) that during the same one-year period the defendant stole, embezzled, obtained by fraud, knowingly converted, or otherwise intentionally misapplied property that was under the care, custody, or control of the local government or agency or organization; and (4) that the property wrongfully taken or misapplied was valued at $5,000 or more.

Defendants raise multiple challenges to the substantive counts. First, defendant Sullivan moves to dismiss Count Four on the ground that the indictment alleges that he was an agent of CMEEC and a CMEEC member town only until October 2015, Doc. #1 at 5 (¶ 10), which was prior to the time period of 2016 within the scope of Count Four, Doc. #105-1 at 3. The Government agrees, and therefore I will dismiss Count Four against Sullivan.

Defendant Rankin moves to dismiss Count Four on the ground that as chief executive officer of CMEEC he was solely an agent of CMEEC and not any particular member town, such that he cannot be liable under Count Four or for any conduct in 2016 and 2017 which proceeds solely on a theory of misappropriation by agents of CMEEC member towns. The Government responds that the indictment alleges alternative grounds for aiding-and-abetting liability under 18 U.S.C. § 2 on the basis that Rankin aided-and-abetted a violation of section 666 by his co-defendants who were agents of the member towns. Doc. #85 at 22-24. I agree and therefore will deny Rankin's motion to dismiss Count Four on this ground.

Defendants argue that Counts Two and Three are duplicitous in light of their allegations of misappropriation from both CMEEC as well as CMEEC member towns. "An indictment is impermissibly duplicitous where: (1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and (2) the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001). Even assuming improper joinder, I agree with the Government that there is no identifiable prejudice to the defendants in light of the interrelationship between CMEEC and its member towns. Accordingly, I will deny defendants' motion to dismiss on this ground, without prejudice to renewal of this argument at trial.

### 10. *Allegations against Sullivan and DeMuzzio*

Defendants Sullivan and DeMuzzio move to dismiss the indictment on grounds that it fails to allege sufficient facts of their culpable involvement. As noted above, an indictment need only track the elements of the offense and allege facts (such as time and place) with sufficient precision to give defendants fair notice of the charge they must defend against at trial. *See, e.g.*, *United States v. Bout*, 731 F.3d 233, 240 (2d Cir. 2013); *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). The indictment does so here. It alleges that both Sullivan and DeMuzzio

were members of CMEEC's board of directors and participants (along with Sullivan's family members and DeMuzzio's friend) in one or more of the trips at issue.

Sullivan and DeMuzzio's motions appear to rest on the theory that merely attending the trips is not sufficient to implicate them in the misappropriation of CMEEC/member town funds. But the indictment alleges sufficient facts to show that Sullivan and DeMuzzio, by virtue of their roles as CMEEC directors, each knew that CMEEC funds were to be used for their personal benefit and not CMEEC's purposes, and accepted those personal benefits as trip attendees despite knowing that the money used to pay for them was misappropriated. These are sufficient facts to give fair notice to Sullivan and DeMuzzio what the Government claims they did wrong, and the fact that the indictment does not contain as many factual allegations specific to Sullivan and DeMuzzio as it does for some of the other defendants is not grounds for dismissal.

### 11. Allegations regarding concealment of conspiracy

Defendants move to dismiss the indictment or to strike such allegations of the indictment that allege as "overt acts" the efforts by certain defendants to conceal their activities in September and October 2016 in response to media and other inquiries about their trips. Doc. #1 at 15-17 (¶¶ 56-61). According to defendants, such "alleged acts of concealment do not extend the life of the conspiracy after its central purpose has been attained." Doc. #92-1 at 1 (citing *Grunewald v. United States*, 353 U.S. 391 (1957), and *Krulewitch v. United States*, 336 U.S. 440 (1979)).

I will deny defendants' motion for substantially the reasons stated by the Government in its objection. The Government has alleged an ongoing conspiracy from 2014 to 2017, including plans to return to the Kentucky Derby in 2017, such that the indictment properly alleges that the concealment activities in September and October 2016 occurred during the charged conspiracy period.

Even assuming defendants were correct that the alleged concealment activities took place after the conspiracy had concluded, "[m]otions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001). The concealment allegations are plainly relevant and not unfairly prejudicial to the extent that they bear on defendants' state of mind and possible consciousness of guilt in concealing their activities.

Moreover, because the indictment is legally sufficient apart from these allegations of concealment activities, the concealment allegations do not warrant dismissal of the indictment or that they be stricken. *See United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993) (district court did not abuse discretion by declining to strike allegations of incriminating post-conspiracy statements from the indictment). Accordingly, I will deny the motion to dismiss the indictment or to strike the concealment allegations without prejudice to defendants' proposal of jury instructions that limit what actions the jury at trial may consider as integral to the conspiracy.

### B.      *Alleged misconduct by the Government*

Defendants argue that the Government engaged in various forms of misconduct during the investigation of this case. I will consider each argument in turn.

#### 1.      *Alleged false evidence presented to the grand jury*

Defendants move to dismiss the indictment or for disclosure of grand jury transcripts on grounds that the Government knowingly presented false information to the grand jury. Defendants focus their claim on a portion of Paragraph 21 of the indictment which alleges that the defendants "did not include the costs for the trips as budget expenses in the general administrative budgets proposed to and approved by the CMEEC Board of Directors." Doc. #1 at 7-8 (¶ 21). According to defendants, this allegation is false and was known to be false in light of

pre-indictment materials submitted by defendant Rankin's counsel to Government counsel and in light of the statements of an unindicted board member as summarized in an FBI interview report. *See* Doc. #85 at 27-33.

A prosecutor may not mislead a grand jury by knowingly presenting false evidence. *See United States v. Hogan*, 712 F.2d 757, 759 (2d Cir. 1983); *United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir. 1979). Thus, "in cases where over-zealous prosecutors have manipulated a grand jury by willfully misleading it or knowingly presenting false evidence, courts have not hesitated to exercise their power to dismiss indictments." *United States v. Udziela*, 671 F.2d 995, 998 (7th Cir. 1982) (collecting cases).

Still, the proceedings of a grand jury are entitled to secrecy as well as to a presumption of regularity. *See United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994). And an indictment is not subject to challenge or dismissal simply because a defendant doubts the validity of what evidence was presented to the grand jury. As the Supreme Court has explained, "[i]f indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed," and "[t]he result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury." *Costello v. United States*, 350 U.S. 359, 363 (1956).

These concerns are reason for courts to greet with some skepticism a claim that a prosecutor has knowingly misled the grand jury with false evidence. It is one thing to disagree with an allegation in an indictment. It is another to claim that the allegation is so obviously untrue that it must be the product of a prosecutor's choice to dupe the grand jury with false evidence. In any event, such a claim of prosecutorial misconduct may not prevail absent a

showing that the false evidence actually affected the grand jury's decision to return an indictment. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).

Based on my review of defendants' materials and the Government's response, I conclude for substantially the reasons stated by the Government in its memorandum (Doc. #114 at 42-50) that defendants have not made a *prima facie* showing of prosecutorial misconduct. Defendants principally rely on a letter that Rankin's counsel sent to prosecutors on June 26, 2018, during the course of pre-indictment discussions. The letter was labeled "For Settlement & Negotiation Purposes Only" and without a request that its content be submitted for consideration to the grand jury. The letter included budget materials allegedly presented to the board including a general "Expenses" line item for $350,000 in 2015 and $400,000 in 2016. Doc. #85 at 29.

These line items did not detail the nature of these expenses as trips to see the Kentucky Derby or trips to play golf in West Virginia or as "costs" for any "trips" at all. Indeed, defense counsel acknowledged in his letter to the prosecutors that "the 'Expenses' line-item" that was in the packet submitted to the board was only "provided at a macro-level." Doc. #85 at 29. He conceded that "the 'Expenses' line-item did not detail the strategic retreats . . . ." *Ibid.* This submission from defense counsel does not tend to prove that Government prosecutors must have known the allegation of Paragraph 21—that the defendants "did not include the costs for the trips as budget expenses in the annual general administrative budgets proposed to and approved by the CMEEC Board of Directors"—was false.

Defendants' claim relies on a readily contestable interpretation of Paragraph 21—that this allegation means that the "costs of the trips" were not among those costs subsumed within the total "expenses" submitted to the board. Paragraph 21 may just as well be understood to allege that the defendants did not identify "costs for the trips" as an "expense" in what was submitted to

the board. This latter interpretation is reinforced by a subsequent allegation in Paragraph 23 of the indictment that defendants do *not* challenge as knowingly false. Paragraph 23 alleges that defendants "directed that the funds used in part and in whole to pay for the trips be designated as 'board expenses' and 'delegation related expenses' in reports concerning the CMEEC Margin account." Doc. #1 at 8 (¶ 23).

Defendants also rely on an FBI interview report of a senior unindicted CMEEC board member. The quoted portion of this interview report states that the board member told the FBI "from memory that the CMEEC budget listed expenses *for travel* which was $400,000." Doc. #85 at 30 (emphasis added). Even defense counsel's "macro-level" budget submission does not bear out this witness's claim "from memory" that the board was told these expenses were "for travel," much less for travel to the Kentucky Derby and to play golf in West Virginia.[9]

All in all, I conclude that defendants have not made an adequate showing that the Government knowingly presented false evidence to the grand jury. Nor am I convinced that there is any appropriate basis for further grand jury disclosure or an evidentiary hearing on this issue. And even if I were to conclude that there was some well-founded basis to conclude that Paragraph 21 of the indictment was the product of prosecutorial misconduct, defendants have not shown that this error—which involves a portion of a single factual allegation among very many more in the indictment—influenced the grand jury's decision to return the indictment against them. Accordingly, I will deny defendants' motion to dismiss the indictment or for additional grand jury disclosure due to alleged prosecutorial misconduct.

---

[9] Defendants have filed a reply brief (Doc. #122) attaching many more budget and auditor documents to try to support their claim of prosecutor misconduct. Any such new facts and materials should have been submitted in the first instance when the Government had an appropriate opportunity to respond to them. I decline to consider them now.

## 2. *Alleged violation of grand jury secrecy*

Defendants argue that the Government breached grand jury secrecy in violation of Fed. R. Crim. P. 6 and their constitutional rights. First, they claim sealed indictments and a draft of what would become the indictment was improperly disclosed to a public affairs officers at the U.S. Attorney Office. Doc. #85 at 37-38. Next they argue that one of the FBI agents investigating this case improperly disclosed grand jury information to an FBI supervisor. *Id.* at 38. Finally, they allege that someone associated with the Government leaked a grand jury subpoena to a Connecticut newspaper before the subpoena had been served. *Id.* at 38-39.

Federal Rule of Criminal Procedure 6 governs grand jury conduct, and Rule 6(e)(2) governs secrecy obligations regarding grand jury documents. Rule 6(e)(2)(B) prohibits, in relevant part, the Government from disclosing "matters occurring before the grand jury," such as "evidence actually presented to that body but also anything that may tend to reveal what transpired before it, such as summaries of grand jury testimony." *United States v. Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir. 1991). As with other instances of grand jury misconduct, a court may dismiss an indictment for a violation of grand jury secrecy under Rule 6(e), but a court may do so only if the misconduct had a substantial effect on the grand jury's decision to indict. *See United States v. Walters*, 910 F.3d 11, 22-23 (2d Cir. 2018). In addition, to the extent that a breach of grand jury secrecy is framed as a violation of constitutional due process, a defendant must show "a history of systematic and pervasive prosecutorial misconduct" to warrant "dismissal of an indictment." *Id.* at 25.

Here, I agree with the Government's arguments that any possible breaches of grand jury secrecy are speculative and minor. Doc. #114 at 52-59. Defendants have done nothing to show that any possible breach affected the grand jury's decision to return an indictment against them or that there is a history of systematic and pervasive prosecutorial misconduct. Nor have they

made an adequate showing to warrant a hearing. Accordingly, I will deny their motion to dismiss the indictment or for a hearing on grounds of any breach of grand jury secrecy.

### 3. *Alleged improper advisement of target/subject status*

Pryor (joined by most of the other defendants) moves to dismiss the indictment or for a hearing on the ground that the Government improperly interviewed him without advising him that he was a subject or target of the investigation. Pryor argues that the Government's conduct violated his Fifth Amendment right to due process as well as his Sixth Amendment right to counsel and that the Court should further exercise its supervisory authority to dismiss the indictment because of the prosecutors' misconduct.

According to an affidavit that Pryor has submitted from CMEEC's counsel, the Government made a request to CMEEC's counsel in January 2018 to interview Pryor and told CMEEC's counsel that Pryor was not a subject or target of the investigation. Doc. #102-2 at 2 (¶ 5). Pryor did not have his own personal attorney at that time. On February 14, 2018, Pryor was interviewed at the U.S. Attorney's Office with CMEEC's counsel present. *Id.* at 3 (¶ 7).

On or about May 8, 2018, one of the prosecutors advised CMEEC counsel that the Government wanted to re-interview Pryor. *Ibid.* (¶ 8). The prosecutor stated that "nothing had changed regarding Mr. Pryor's status in the investigation; that is, that Mr. Pryor remained a witness." *Ibid.* Several days later, on May 14, 2018, the prosecutor advised CMEEC's counsel that "[a]fter thinking out it further, [the prosecutors] agree that Mr. Pryor needs independent counsel," and "[p]lease let us know when this has been conveyed to Mr. Pryor so that we can engage with his new lawyer." *Ibid.* (¶ 9).[10]

---

[10] Although Pryor's briefing alleges additional facts beyond those stated in any affidavit or evidentiary submission, they are disputed by the Government, and I decline to consider them for lack of appropriate foundation. *See, e.g.*, *United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967); *United States v. Morgan*, 2016 WL 1071108, at *2 (S.D.N.Y. 2016).

A defendant who seeks dismissal of an indictment on grounds of governmental misconduct faces a "very heavy burden" to "show that the Government's conduct was so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction." *Walters*, 910 F.3d at 27 (cleaned up). "This inquiry turns on whether the governmental conduct, standing alone, is so offensive that it shocks the conscience." *Ibid.* Moreover, dismissal of an indictment is not justified absent a showing of prejudice from the alleged misconduct. *Ibid.*

I will deny Pryor's motion for substantially the reasons stated by the Government in its objection. The facts only weakly suggest that prosecutors regarded Pryor as a target or subject at the time they interviewed him in February 2018. Even assuming that Pryor was misadvised about his subject or target status at that time, the Constitution does not guarantee such an advisement, and—standing alone—any such misadvisement does not warrant the extraordinary remedy of dismissal of an indictment. *See, e.g.*, *United States v. Mangano*, 2018 WL 851860, at *13-*15 (E.D.N.Y. 2018) (noting that "[t]he government's failure to identify [an interviewee] as a target is not a basis for a due process claim" and "even if the government affirmatively misrepresents an individual's target status, such conduct does not warrant suppression or dismissal").[11]

---

[11] Pryor cites a case from the District of Connecticut for the proposition that "the Government's failure to warn a putative defendant that he was a 'suspect' of the Government's investigation prior to his grand jury testimony" justified dismissal of an indictment. Doc. #102-1 at 11 (citing *United States v. Pepe*, 367 F. Supp. 1365 (D. Conn. 1973)). The *Pepe* case, however, is distinguishable on grounds that the Government misled a suspect in connection with his decision to testify before a grand jury, and the case also included additional aggravating factors that the prosecutor "fail[ed] to warn [the grand jury witness] that he had a right to remain silent, and . . . induc[ed] him to answer questions by the threat of a non-existent immunity order." *Id.* at 1366-67. Here, Pryor has not established any governmental threats, and because he was not in custody during his interview he had no *Miranda* right to any warning about his right to remain silent. *See, e.g.*, *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017). Nor did any possible misconduct by the Government violate Pryor's Sixth Amendment right to counsel, because this right attaches only upon the initiation of criminal charges and does apply at the stage of a pre-charge interview like the one at issue here. *See United States v. Medunjanin*, 752 F.3d 576, 585, 589 (2d Cir. 2014).

Moreover, Pryor has not shown prejudice in light of the Government's representation that it will not use his statements obtained during the course of the February 14 interview in its case-in-chief and will treat those statements as if protected by a proffer agreement. Indeed, even if the Government had violated Pryor's constitutional *Miranda* rights, his remedy would solely be for suppression of the statements obtained (which the Government has agreed to do) and not the suppression of any deriviative evidence, much less outright dismissal of the charges. *See United States v. Patane*, 542 U.S. 630 (2004). Likewise, Pryor's co-defendants have no right to relief for any violation of Pryor's personal rights. *See United States v. Payner*, 447 U.S. 727 (1980). My denial of this motion is without prejudice to its renewal in the event that the Government seeks to use his statements from the February 14 interview for purposes of impeachment at trial.

### C.      *Motion for Severance*

Pryor moves to sever his trial from the trial of his co-defendants. Rule 14 of the Federal Rules of Criminal Procedure allows a district court to grant a severance "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant." Fed. R. Crim. P. 14(a). As the Supreme Court has made clear, however, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together," because "[j]oint trials play a vital role in the criminal justice system, as they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (cleaned up).

For this reason, severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. And the "defendant seeking severance must show that the prejudice to him from joinder is sufficiently severe to outweigh the

judicial economy that would be realized by avoiding multiple lengthy trials." *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998) (citation omitted).

Pryor argues that severance is warranted on grounds that the indictment alleges two separate conspiracies that should not have been joined under Fed. R. Crim. P. 8 in a single indictment and of which he was allegedly a member of only one conspiracy. But "[t]he mere allegation of a conspiracy presumptively satisfies [the joinder requirements under] Rule 8(b), since the allegation implies that the defendants named have engaged in the same series of acts or transactions constituting an offense." *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988) (cleaned up).

It is clear from the face of the indictment that it alleges a single ongoing conspiracy involving the misappropriation of funds. As Pryor acknowledges, he took part in three of the four trips that are the focus of the indictment, and as chief financial officer he was involved with accounting for trip expenses in a manner that is described in the indictment. Doc. #1 at 9 (¶¶ 28-29). The fact that Pryor missed one of the four trips at issue in the indictment does not signify that any wrongful conduct involving that particular trip was legally required to have been charged by the Government as a wholly separate conspiracy. Although there are factual differences between particular trips and between the involvement of all the defendants, there is nothing on the face of the indictment to support Pryor's claim that the indictment alleges two conspiracies as a matter of law.

Pryor argues that he will be subject to prejudicial spillover to the extent that there will be more evidence against his co-defendants at trial than against him. But "differing levels of culpability and proof," such that some defendants have "less important roles" in a conspiracy, "are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for

separate trials." *United States v. Chang An-Lo*, 851 F.2d 547, 557 (2d Cir. 1988). And severance is not "necessarily required by the fact that evidence may be admissible against one defendant but not another, especially where the charges against the defendants are straightforward and the jury is properly instructed to consider the evidence against each defendant separately." *United States v. O'Connor*, 650 F.3d 839, 858-59 (2d Cir. 2011). To the extent that Pryor may believe that the jury would improperly consider evidence that is offered solely against co-defendants as evidence against him, Pryor may request appropriate cautionary and limiting instructions at trial.

Pryor also argues that his defense will be at odds with the defenses of his co-defendants. But he does little to demonstrate how any defense presented by his co-defendants will tend to implicate him or, conversely, how any defense he may present would jeopardize his co-defendants' right to a fair trial. He agrees that all the defendants will argue that they believed that what they were doing was legal. To the extent that he may testify or present evidence about assurances to him from his co-defendants concerning board approval of the expenses, this is fully consistent with his co-defendants' claim that the CMEEC board indeed authorized these expenses.

The fact that Pryor held a different and less senior position at CMEEC and played a different alleged role in the conspiracy does not mean that any of his defenses will be mutually antagonistic, and—more importantly—that any of the defenses to be presented by his co-defendants will jeopardize his right to a fair trial. In any event, "[t]he possibility that codefendants may mount mutually antagonistic defenses is not itself a ground for severance where the risk of prejudice can be offset by less drastic measures devised by the district court, such as limiting instructions." *O'Connor*, 650 F.3d at 858.

Pryor has not shown misjoinder or that his trial should be severed from that of his co-defendants in order to protect his right to a fair trial. Accordingly, I will deny his motion to sever.

### D.     *Motions for bills of particulars*

Defendants move for bills of particulars. Defendants seek a long list of particulars, which can be summarized (harmonizing overlapping requests) as follows:

1. The programs that provided CMEEC with federal funds in excess of $10,000 for each year between 2014 through 2017, including the names of the specific programs providing funding, the specific amounts of funding, and the method by which the funds were transferred. Docs. #89 at 2-3, #93-1 at 2-3, #98 at 1, #100-1 at 10.
2. Same as #1, but for the CMEEC member towns, with specification of precisely which town received what funds where, how, and for what purposes. Docs. #93-1 at 3, #98 at 1.
3. The amount the defendants are alleged to have misappropriated, specifically the precise sum alleged to be misappropriated attributed to each defendant in each of 2014, 2015, and 2016. Docs. #89 at 3, #98 at 2-3.
4. Whether the defendants embezzled, stole, defrauded, converted, or intentionally misapplied property (or all or some of the above). Docs. #89 at 4, #93-1 at 3.
5. The persons "known" to the grand jury to have attended the four trips. Docs. #89 at 4-5, #93-1 at 5, #98 at 4.
6. Whether CMEEC ever failed to fulfill its purpose, and if so, when and how it did so. Doc. #93-1 at 2.
7. The government's theory as to how CMEEC Board rules were violated and their bearing on the legal theory of the case. Doc. #93-1 at 3-4.
8. What acts were taken in furtherance of the conspiracy charged in Count One between 2014 and 2017, as well as which specific acts demonstrate that each co-conspirator knowingly and intentionally joined the conspiracy and agreed to commit the section 666 offenses. Docs. #93-1 at 5, #98 at 3.
9. Precisely when the conspiracy charged in Count One began and ended, and whether the government considers the acts including the Kentucky Derby trips and the acts concerning the golfing trips to be separate conspiracies. Doc. #100-1.
10. The specific acts, conduct, or statements of each defendant indicating that they conducted the business and affairs of CMEEC for their personal benefit, that they intended to conceal the conspiracy, and that part of the conspiracy was to not disclose the fact of the trips. Doc. #98 at 4.
11. The specific overt acts alleged to have been undertaken by defendants DeMuzzio and Pryor, with details concerning DeMuzzio and Pryor's participation in each of the acts charged in the indictment and disclosure of all evidence the government alleges establishes DeMuzzio and Pryor acted with the requisite intent. Docs. #97 at 2-3, #100-1.

12. All legal advice or opinions provided to CMEEC by any attorneys concerning the trips. Doc. #97 at 4.

A court has discretion to require the filing of a bill of particulars if the allegations of the indictment are insufficient to permit the preparation of an adequate defense. *See, e.g.*, *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007). On the other hand, a court may deny a bill of particulars for any of three reasons: (1) if the allegations of the indictment are enough to serve fair notice, (2) if the information requested is ascertainable from the Government's pre-trial disclosures, or (3) if a defendant does not otherwise show that the information sought is necessary to his preparation of a defense. *See, e.g.*, *United States v. Ramirez*, 609 F.3d 495, 502 (2d Cir. 2010); *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004).

The proper inquiry for a court when considering a motion for bill of particulars is whether the information sought has not been disclosed and is actually necessary—rather than simply helpful—to the defense. Defendants are not entitled to a roadmap of how the Government will attempt to prove its case, a laundry list of each act the Government considers significant, or a flow chart of the Government's advocacy theories. *See, e.g.*, *United States v. Chambers*, 2018 WL 1726239, at *2 (S.D.N.Y. 2018); *United States v. Kogan*, 283 F. Supp. 3d 127, 132 (S.D.N.Y. 2017).

I will deny the motions for bills of particulars for largely the reasons stated in the Government's omnibus response. Doc. #112. The indictment amply alleges many details of the Government's evidence and provides more than enough detail to allow defendants to claim the protection of the Double Jeopardy Clause in the event of a successive prosecution. This is not a case where the Government has filed a bare-bones indictment alleging nothing more than the minimum elements of the charged crime. Instead, it has provided in great detail the "who, what, when, where, and why": just what acts comprised the claimed conspiracy, as well as the theft of

CMEEC or member town funds, approximately when the acts took place, who did what within the conspiracy, where the conspiracy occurred, and why defendants are claimed to have done what they did.

The government has represented—and defendants do not dispute—that it has already furnished 375,000 pages of documentary discovery providing in detail the evidentiary basis for the charges in the indictment. Doc. #112 at 11-13 (describing government's disclosures). In certain places, the Government has promised fuller disclosures to defendants. Defendants do not provide a convincing explanation, in light of this discovery, for the necessity of a bill of particulars. If defendants believe that the discovery provided is not sufficient and they are unable to resolve the issue with the Government, they should promptly advise the Court.

CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the indictment, Docs. #86, #90, #91, #92, #94, #95, #102, #103, #105, #107, #109, #111, are DENIED, except insofar as Count Four of the indictment is DISMISSED against defendant Sullivan without objection. Defendants' motions for a bill of particulars, Docs. #88, #93, #97, #98, #100, #101, #106, #108, #110, are DENIED. Defendant Pryor's motion to sever, Doc. #104, is DENIED.

It is so ordered.

Dated at New Haven this 15th day of November 2019.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge