# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

DREW RANKIN, JAMES SULLIVAN,
JOHN BILDA, EDWARD DEMUZZIO,
AND EDWARD PRYOR,
    *Defendants*.

No. 3:18-cr-272 (JAM)

### ORDER GRANTING IN PART AND DENYING IN PART GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE ASPECTS OF THE DEFENDANTS' PROPOSED EXPERT TESTIMONY

This is a federal criminal case in which the defendants plan to offer expert testimony about accounting anfd corporate governance. The Government moves *in limine* to preclude aspects of this testimony. For the reasons that follow, I will grant the motion in part and deny it in part.

### BACKGROUND

The Government has charged the defendants with conspiring to misappropriate and criminally misappropriating funds in violation of 18 U.S.C. §§ 371 and 666(a)(1)(A). *See generally United States v. Rankin*, 422 F. Supp. 3d 564, 573-577 (D. Conn. 2019) (summarizing allegations of indictment).

The defendants were all officers or directors of the Connecticut Municipal Electric Energy Cooperative ("CMEEC"). According to the Government, the defendants misappropriated the funds of CMEEC and its members when they used these funds for personal purposes to pay for trips to the Kentucky Derby and a West Virginia golf resort. By contrast, the defendants maintain in part that these trips were lawful corporate retreats and that they did not act with an unlawful intent or purpose to warrant a criminal conviction.

1

To support their defense, the defendants plan to offer expert testimony from an accountant named John Salomon and a corporate law professor named Jonathan Macey. Salomon plans to testify about CMEEC's accounting practices and its compatibility with generally accepted accounting principles. Professor Macey plans to testify about corporate governance principles applicable to CMEEC and other corporations. While the Government concedes that these witnesses are experts in their fields and that much of their proposed testimony is proper, it challenges certain aspects of their proposed testimony.[1]

## DISCUSSION

Before addressing the Government's challenges, I will briefly review the background legal standards that govern the admissibility of expert opinion evidence. Federal Rule of Evidence 702 allows for expert testimony if the following conditions are met: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied principles and methods to the facts of the case." Fed. R. Evid. 702.

"It is well established that expert testimony admitted under Rule 702 must be relevant, meaning it must help the trier of fact to understand the evidence or to determine a fact in issue." *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 20 (2d Cir. 2021).[2] "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008).

---

[1] Doc. #311 at 11. Although the Government also seeks to preclude a third expert (John Cochrane), the defendants have recently advised that they do not intend to call this expert.

[2] Unless otherwise noted, this ruling omits all internal quotations, citations, brackets, and other alterations in its quotations and citations of case decisions.

Although it is true that an expert opinion "is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704, it is ordinarily improper for an expert to testify on an ultimate legal conclusion or communicate a legal standard—explicit or implicit—to the jury. *See Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). "Expert testimony that usurps the role of the factfinder or that serves principally to advance legal arguments should be excluded." *Choi*, 2 F.4th at 20. Thus, for example, the Second Circuit has found error in a police-excessive-force case for an expert to testify that the officer's "conduct was not 'justified under the circumstances,' not 'warranted under the circumstances,' and 'totally improper.'" *Hygh*, 961 F.2d at 364. Similarly, "an expert's testimony that a defendant was 'negligent' should not have been allowed." *Ibid.*

Notwithstanding the usual rule that an expert should not testify about the law or ultimate conclusions that a jury will be asked to decide, an expert may properly testify on "background legal concepts and related practices" that are important to the jury's determination of facts, and "[t]his is especially true where there are background or subsidiary principles of law that may govern or influence the parties' conduct but that are not directly at issue with respect to the law that will form the basis for final jury instructions." *Coan v. Dunne*, 2019 WL 2169879, at *1 (D. Conn. 2019) (allowing expert testimony about background concepts of Irish real estate law for purposes of trial concerning bankruptcy fraud); *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 268 (D. Conn. 2017) (discussing how expert may testify in corporate fraud case about background corporate governance concepts such as "the respective roles of a corporation's directors and officers, the nature of an officer's fiduciary duties to the corporation, or the concept of parent-subsidiary corporate separateness"). Thus, such "expert testimony may help a jury understand unfamiliar terms and concepts" and is permissible if "carefully circumscribed to assure that the

3

expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Bilzerian*, 926 F.2d at 1294.

Because expert testimony is not a substitute for proper fact testimony, a court should guard against the misuse of expert testimony to establish that certain facts occurred when the occurrence or non-occurrence of such facts could be readily established in the first instance by the testimony of a fact witness. Thus, an "expert may not simply recite a factual narrative from one party's perspective, granting it credibility, when he has no personal knowledge of the facts addressed." *SLSJ*, 277 F. Supp. 3d at 280.

Similarly, it is generally improper for an expert to opine about what a party knew or intended at the time of events in question. *See Gibbs v. Borona,* 2021 WL 1171558, at *1 (D. Conn. 2021) (precluding expert from testifying about what a defendant police officer "knew or was thinking" when he shot a suspect). Outside the context of expert psychiatric testimony, a party's state of mind is not ordinarily a proper subject of expert testimony.

### *Testimony of John Salomon*

In light of the governing legal standards, I will grant in part and deny in part the Government's motion *in limine* to preclude aspects of the testimony of John Salomon.

#### *A. Testimony that the contra-margin account was lawful*

First, the Government moves to exclude testimony by Salomon that "CMEEC's Officers' and Board Members' use of the contra-margin mechanism was a proper way to account for the Board Retreats that allowed CMEEC to fairly allocate expenses only to those member utilities whose board members participated in the Board Retreats."[3] The Government argues that this testimony is improper because a witness may not opine on whether something is legally

---

[3] Doc. #311 at 12.

"permissible," and also because the factual premise for the testimony is incorrect insofar as there were member utilities whose board members did not take part in the alleged retreats.

I conclude that Salomon may testify concerning whether the creation of a contra-margin account and its operation were consistent with generally accepted accounting principles and therefore that—standing alone—the use of a contra-margin account does not violate the law. Salomon, however, may not offer any opinion that the use of a contra-margin account was lawful apart from whether its use is allowed under generally accepted accounting principles.

I will also preclude Salomon from testifying that use of the contra-margin account was justified and fair because—as the defendants claim—expenses "were allocated to the CMEEC member utilities who participated in the Board meetings where the budgets for the retreats were approved and whose Board representatives were invited to attend the retreats."[4] The defendants have not shown that the jury needs any expert testimony in order to understand whether the use of the contra-margin account was fair or justifiable for these reasons (and which the Government disputes). The defendants are free to rely on and offer fact witness testimony to explain the reasons why they believe it was legitimate to use a contra-margin account for trip expenses.

B. *Testimony that the accounting was "highly transparent"*

The Government next moves to preclude testimony that CMEEC's contra-margin accounting was "highly transparent" and "consistent with [the defendants'] belief that such accounting was proper, legal, and consistent with CMEEC's budget."[5] The Government argues that this testimony would "reflect[ ] impermissible speculation about the mental states of parties and others."[6]

---

[4] Doc. #350 at 4.
[5] Doc. #311 at 15.
[6] *Ibid.*

5

I conclude that Salomon may testify on the basis of his expert knowledge and experience about the degree to which the use of the contra-margin account was discernible or visible in CMEEC's accounting records for any auditor or other reviewer to see and more generally about the appropriateness of CMEEC's auditing process and practices. In order to evaluate the defendants' claim that the trip expenses were not improperly concealed, the jury would be assisted by an expert's opinion on the specialized issues of the degree to which transactions in CMEEC's accounting books and records would tend to be apparent to auditor or outside review and the degree to which CMEEC's auditing practices were appropriate.

On the other hand, I will preclude Salomon from testifying that the transparency or visibility of the use of the contra-margin account and CMEEC's auditing practices were consistent with an innocent state of mind of the defendants. The "imprimatur" of expert testimony will be "neither necessary nor helpful for the jury to make an assessment of [the defendants'] state of mind." *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993); *see also ARMOUR Cap. Mgmt. LP v. SS&C Techs., Inc.*, 2020 WL 64297, at *8 (D. Conn. 2020) (excluding "testi[mony] about what [a party] actually knew, because [the expert] [wa]s not a fact witness who can testify about what [the party] actually knew").

Nor may the defendants evade this prohibition by having Salomon testify that the accounting treatment of the contra-margin account was "consistent generally with such a belief" that it was proper, rather than testifying that "the defendants' themselves held such a belief."[7] This is a distinction without a difference. The jury does not need an expert to tell them what to conclude about what any of the defendants knew or intended.

---

[7] Doc. #350 at 6 (emphasis omitted).

*C. Testimony about Pryor's "consistently forthright" communications*

For substantially the same reasons, I will preclude Salomon from testifying that "Pryor's communications with [the auditor] Blum Shapiro were consistently forthright, and fundamentally inconsistent with the allegation that the Defendants tried to conceal the Board Retreat Expenses."[8] This proposed testimony amounts to having an expert opine on Pryor's credibility and intentions, and defendants have failed to show that this issue is the proper subject of expert accounting testimony.

*D. Testimony about CMEEC's audit process*

The Government moves to preclude testimony about CMEEC's audit process, arguing that it would include "extended narrative testimony."[9] But because the defendants disclaim any intention to have Salomon engage in an extended narrative about what he thinks the auditors did,[10] I will therefore deny this part of the motion as moot, without prejudice to the Government's objecting at trial if it believes that any part of Salomon's testimony strays into an impermissible factual recitation and narrative.

*E. Testimony that the board trip funds were not commingled with federal funds*

The Government moves to exclude Salomon's testimony that the CMEEC funds used to pay for the trips were never commingled with CMEEC's federal funding.[11] As I explained when the defendants sought to make a similar argument in their opening statements, they have failed "to show why this point is relevant and would not tend to be introduced for any purpose other than to confuse and for jury nullification."[12] This ruling, however, is without prejudice to the

---

[8] Doc. #311 at 17.
[9] *Id.* at 18.
[10] Doc. #350 at 8.
[11] Doc. #311 at 19-21.
[12] Doc. #384 at 4 (citing *Sabri v. United States*, 541 U.S. 600, 604-06 (2004)).

defendants' adducing testimony about the specific sources of funds used to pay for the trips to the extent that such testimony is relevant to any other material issue at trial.

### *Testimony of Professor Jonathan Macey*

The Government moves *in limine* to exclude Professor Macey's testimony altogether. In light of the governing legal standards, I will grant the motion in part and deny it in part.

### A.  *Testimony about corporate governance and the business judgment rule*

First, because CMEEC is a public corporate entity, the Government moves on relevance grounds to preclude Professor Macey from testifying about "[t]he manner in which private corporate entities are governed" and "[t]he manner in which corporate entities make decisions and take action."[13] But a pillar of the defendants' case is that CMEEC's purpose (as the defendants understood it) was to act like a private corporation in order to get more competitive electric rates for its members than a normal public utility could get. Testimony about how private corporations are governed is therefore relevant. To the extent that the Government thinks that the practices of private corporations are not a proper benchmark for CMEEC, it may pursue this point on cross-examination.

The Government next objects to Professor Macey's testimony about the business judgment rule. That rule is "a background rule of state corporate law that limits judicial review of the discretionary business judgments of corporate officers and directors." *Rankin*, 422 F. Supp. 3d at 582 (citing *Rosenfield v. Metals Selling Corp.*, 229 Conn. 771, 785-88 (1994)). The Government argues that it would be improper for Professor Macey to communicate a legal standard to the jury.

---

[13] Doc. #311 at 22.

I do not agree. As I have noted above, notwithstanding the usual presumption against expert testimony on issues of law, expert testimony on matters of background or subsidiary principles of law may be appropriate when germane to a jury's evaluation of a defendant's state of mind. *See Coan*, 2019 WL 2169879, at \*1. If, for example, the prosecution alleges that a defendant has engaged in overt acts to perpetrate or conceal a charged crime, the jury's evaluation of whether the defendant engaged in the acts for a nefarious purpose may turn in whole or in part on whether the overt acts are themselves allowed under background or subsidiary principles of criminal or civil law. So the fact that the defendants propose that Professor Macey testify about a legal principle known as the business judgment rule is not itself a reason to preclude the testimony.

The Government also argues that the business judgment rule is not relevant because it is a rule of civil liability that does not apply in a criminal case. But although the Government is correct that the business judgment rule may serve as a standard for civil *liability*, the business judgment rule is more generally a broad rule of *conduct* that affords a company's managers with considerable discretion to decide what acts serve a valid corporate purpose. Indeed, "the business judgment rule review has evolved to pursue two, somewhat different roles, serving, as one scholar puts it, both as a rule of conduct and as a rule of liability." *See* Robert K. Rasmussen & David A. Skeel, Jr., *Governmental Intervention in an Economic Crisis*, 19 U. PA. J. BUS. L. 7, 46 (2016); *see also* Meir Dan-Cohen, *Decision Rules and Conduct Rules: On Acoustic Separation in Criminal Law*, 97 HARV. L. REV. 625, 626-29 (1984) (discussing general distinction between "conduct rules" such as "[o]ne shall not steal" and "decision rules" such as "if somebody steals, he shall be punished" or liable).

Viewed as a normative rule of conduct (as distinct from merely an enforcement rule of civil liability), the business judgment rule has obvious importance to this case. It instructs that a company's management has discretion to engage in acts that the management believes in good faith will serve the interests of the company and that, even if these acts do not ultimately work out to the company's benefit, this does not necessarily signify that the acts themselves were improper or unlawful. *See, e.g.*, *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 234 (2d Cir. 2015).

Because the business judgment rule (as a rule of conduct) is a pervasive background principle of corporate governance, its operation is relevant here to the jury's evaluation whether the defendants acted with the type of unlawful intent and purpose to warrant conviction under 18 U.S.C. § 371 or 18 U.S.C. § 666. Although the Government fears that the jury may misunderstand the business judgment rule to constitute a rule of absolute immunity, any such risk can be countered on cross-examination (and also upon request by means of a final jury instruction). The Government will be free to cross-examine Professor Macey about the degree to which the business judgment rule does not apply for decisions that are taken for personal—rather than corporate—purposes or for decisions that are otherwise infected with a personal conflict of interest rendering the business judgment rule inapplicable. *See Rankin*, 422 F. Supp. 3d at 582-83; *see also Joy v. North*, 692 F.2d 880, 886 (2d Cir. 1980) (noting that "the business judgment rule extends only as far as the reasons which justify its existence" and does not apply when "the corporate decision lacks a business purpose" or "is so egregious as to amount to a no-win decision" or "results from an obvious and prolonged failure to exercise oversight or supervision"); *Nymbus, Inc. v. Sharp*, 2019 WL 692938, at *5 (D. Conn. 2019) (noting that "a conflict of interest … suggests bad faith conduct well outside the scope of any discretionary

10

business judgment that the business judgment rule is designed to protect"). Accordingly, I will allow Professor Macey to testify about corporate governance principles of private companies and about the business judgment rule.

### B.  Testimony about CMEEC's governing documents

The Government further moves to preclude testimony by Professor Macey about "[t]he processes contemplated by CMEEC's governing laws and documents" and "[t]he authority, responsibilities, and obligations applicable to CMEEC's Board members and corporate officers."[14] I do not agree. As an initial matter, I will allow Professor Macey to explain "the general roles and duties of the defendants and other directors of cooperative public corporations," because even the Government concedes that this aspect of his testimony would be proper.[15] *See also Bilzerian*, 926 F.2d at 1294 (approving background expert testimony on securities law); *SLSJ*, 277 F. Supp. 3d at 268. In addition, I will allow Professor Macey to testify on the basis of CMEEC's enabling statute and corporate documents in order to explain the basics of how the company is structured—for instance, how many directors there are and what the corporate bylaws say about voting procedures—and what limitations are imposed by its enabling law, the corporate bylaws, and the membership agreement.

Similarly, in light of the Government's focus on the absence of any board of directors' vote to explicitly approve the trips at issue and the absence of any mention of the trips in the minutes of the board of directors, I will allow Professor Macey to testify about whether state law or other corporate governance documents required that the CMEEC board of directors formally and explicitly approve the trips or that the board's meeting minutes reference the trips. Of course, the Government will be free to cross-examine Professor Macey about whether any of

---

[14] Doc. #311 at 25.
[15] *Id.* at 26-27.

these laws or documents prevented or prohibited CMEEC from addressing the trips at board meetings or more fully disclosing them in other ways.

    *C.   Testimony about corporate retreats*

    Finally, the Government moves to preclude testimony by Professor Macey about "[t]he types of Board events that private corporations routinely conduct and the reasons why those events are undertaken and perceived to be beneficial."[16] I do not agree. I conclude that it is proper for Professor Macey to testify about how at the relevant time from 2014 to 2016 there was no state law prohibition or limitation on CMEEC's engaging in corporate retreats, about how a retreat may potentially serve a valid corporate purpose, and about how companies commonly engage in retreats. These aspects of subsidiary corporate law and practice are amenable to expert testimony and are important to the jury's consideration of the defense that the trips at issue were actually valid corporate retreats or, at the least, that the defendants reasonably could have believed them to be valid corporate retreats such that they did not act with a criminal purpose or intent when they took part in these trips. The Government will otherwise be free to cross-examine Professor Macey among other subjects about the legal and customary distinction between a corporate retreat and a personal vacation at corporate expense.

    Professor Macey may not opine—directly or indirectly—about whether the particular trips at issue in this case were valid corporate retreats or more generally about any of the defendants' knowledge or state of mind.[17] That is because "overwhelmingly, courts specifically preclude the expert from offering either legal conclusions or opinions that apply corporate governance concepts to the case's specific facts." *United States v. Brooks*, 2010 WL 291768, at *4 (E.D.N.Y. 2010).

---

[16] *Id.* at 27.
[17] Doc. #350 at 16.

CONCLUSION

The Court GRANTS in part and DENIES in part the Government's motion *in limine* to exclude expert testimony (Doc. #311) as set forth above in this ruling. It is so ordered.

Dated at New Haven this 27th day of November 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

13