# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

DREW RANKIN, JAMES SULLIVAN, and
JOHN BILDA,
    *Defendants*.

No. 3:18-cr-272 (JAM)

## RULING DENYING PENDING MOTIONS

A federal trial jury returned verdicts of guilty against three defendants—Drew Rankin,

James Sullivan, and John Bilda—for misappropriating property from a local government agency

that received federal benefits. The three defendants have filed numerous motions for judgment of

acquittal, for a mistrial and new trial, for dismissal of the indictment, and for disclosure of grand

jury records. For the reasons set forth at length in this ruling, I will deny the motions.

### BACKGROUND

This case is about the Connecticut Municipal Electric Energy Cooperative, which

everyone calls CMEEC ("See-Meck"). CMEEC is a publicly owned company created under a

Connecticut law designed "to permit municipal electric utilities in Connecticut to join together

and form cooperative public corporations … for the purpose of furnishing efficient, low cost and

reliable electric power in their areas of operation." Conn. Gen. Stat. § 7-233a. CMEEC's main

function was to go into the open market and buy blocks of electric power to furnish to municipal

utilities at prices that were cheaper than the utilities could get if they bought it themselves.[1]

CMEEC was owned by several Connecticut municipalities that the indictment refers to as

the "Member Towns."[2] It had a board of directors with representatives from each of its several

---

[1] Trial Transcript ("Tr.") at 94–97.
[2] Government Exhibit ("Gx") 2 at 3; Tr. 94–99. The parties dispute whether CMEEC was owned by the member *towns* (as the government claims) or only by the *municipal electric utilities* of the member towns (as the defendants

members.[3] The two members with the largest ownership shares of CMEEC were the City of Norwich and the City of Groton.[4]

The prosecution of this case resulted from a public scandal that broke in late 2016. News reports emerged that CMEEC had paid for large group trips to the Kentucky Derby involving private jet travel, luxury accommodations, and high-priced premium ticket packages. This in turn led the FBI to investigate whether the defendants had violated a federal statute—18 U.S.C. § 666(a)(1)(A)—that makes it a crime under certain circumstances to embezzle, steal, obtain by fraud, or otherwise intentionally misappropriate property from local towns or public governmental entities like CMEEC that receive federal benefits.

In November 2018, a federal grand jury returned an indictment against the following five defendants:

- Drew Rankin, CMEEC's chief executive officer;

- James Sullivan, CMEEC's chairperson of the board of directors and a CMEEC board representative from Norwich until late 2015;

- John Bilda, a CMEEC board representative from Norwich;

- Edward DeMuzzio, CMEEC's board secretary and a CMEEC board representative from Groton; and

- Edward Pryor, CMEEC's chief financial officer.

The indictment charged all five of the defendants with a conspiracy to violate § 666 and also with substantive violations of § 666 in the years 2014, 2015, and 2016. It alleged that the defendants used money that was "owned, and under the care, custody, and control of CMEEC and the CMEEC Members" to take "lavish trips" to "personally benefit, compensate, and reward

---

claim).
[3] Gx7.
[4] Gx118.

[them and] their family members, friends, and associates."[5] The indictment further alleged that "[t]hese trips did not relate to CMEEC business, CMEEC Member business, and the furnishing of efficient, low-cost and reliable electric power."[6]

It took about three years to bring the case to trial. Some of the delay was because of extensive and complex pre-trial motions.[7] Some of it was because of a snafu with the production of company documents from CMEEC.[8] And the rest of the delay resulted from the onset of COVID-19.

The trial evidence was presented over several weeks in November and December 2021. Consistent with the detailed allegations of the indictment, the evidence focused on five different group trips that were organized by Rankin and paid for by CMEEC to either the Kentucky Derby or to the Greenbrier, a luxury resort in West Virginia.[9] By way of background, I will review the major parts of the government's evidence in its case-in-chief, the defendants' evidence in the defense case, and the jury's verdicts.

### Trip to the Kentucky Derby in 2015

The first trip at issue was to the 2015 Kentucky Derby.[10] At Rankin's direction, his assistant made arrangements in June 2014 through a ticket broker to purchase 30 premium

---

[5] Doc. #1-1 at 6 (¶ 16), 7 (¶ 19).
[6] *Id.* at 7 (¶ 19).
[7] *See, e.g.*, *United States v. Rankin*, 422 F. Supp. 3d 564 (D. Conn. 2019) (order denying defendants' numerous motions to dismiss indictment); *United States v. Rankin*, 2019 WL 6894094, at *1 (D. Conn. 2019) (order denying defendants' motion to certify certain questions to the Connecticut Supreme Court); *United States v. Rankin*, 2020 WL 3036015 (D. Conn. 2020) (order granting government's motion to compel and granting motion for a protective order); *United States v. Rankin*, 2020 WL 4188014 (D. Conn. 2020) (order denying defendants' motion to move trial or preclude certain jurors); *United States v. Rankin*, 2021 WL 5049354 (D. Conn. 2021) (omnibus order on pre-trial motions); *United States v. Rankin*, 2021 WL 5563996 (D. Conn. 2021) (order regarding proposed expert testimony).
[8] Doc. #208.
[9] Although the resort refers to itself as "The Greenbrier," I will use the term "Greenbrier" in this ruling.
[10] The 2015 trip was not the first CMEEC trip to the Kentucky Derby. The government's first witness testified without objection to prior group trips initiated by Rankin at CMEEC expense that occurred in 2013 and 2014. *See* Tr. 143–47; *see also* Tr. 3464 (cross-examination of Rankin).

"Trophy Room" ticket packages for more than $200,000.[11] Rankin later sent out an invitation to CMEEC's board of directors billing the event as a "strategic retreat" for "you as dedicated and awesome Board Members and your Strategic Guests / Partners" to enjoy a "weekend of celebration and strategic time together, learning more about each other through unique shared experiences."[12]

All five of the defendants except DeMuzzio attended the 2015 Kentucky Derby.[13] There was no documentary evidence that the defendants did any work on this trip. For example, the agenda for the trip had entries like "street festivals" and "[e]at, drink, be merry, and watch races all day"—but not any work meetings.[14]

The trip was also lavish. The ticket-and-hotel package cost about $7,000 for each person, in addition to a group dinner for $10,827 and about $54,000 in private jetfare.[15] When the private jet company warned Rankin that "going by private charter [would] be much more expensive than flying on a scheduled commercial airline," Rankin replied that he wanted to do it anyway because it would be "much more convenient and classy."[16]

In all, the 2015 Derby trip cost about $300,000—more than $9,000 per guest.[17] Yet many if not most of the guests had nothing or little to do with CMEEC's business activity. For example, Sullivan—who was then serving as chairman of CMEEC's board of directors—brought his brother, his sister-in-law, his son, a young woman who was his bartender, and his bartender's friend.[18] The bartender worked at a bar in a building where Sullivan lived in Washington, D.C.,

---

[11] Gx200; Tr. 324–27, 1065.
[12] Gx306 at 2–3; Tr. 226–228.
[13] Gx561A; Tr. 503.
[14] Gx306 at 4.
[15] Gx200; Gx303; Gx319; Gx321.
[16] Gx301 at 8; Tr. 332–33.
[17] Gx566.
[18] Gx561A; Tr. 351, 1238–41, 3407, 3828, 3873, 4183.

and she testified about how Sullivan had invited her and a guest to ride on the private jet and to enjoy the all-expenses-paid lodging and tickets to the Kentucky Derby and how neither she nor her guest had anything to do with CMEEC.[19]

Bilda—a board member from Norwich—brought not only his wife but also his parents who lived in Florida and who had no connection to CMEEC.[20] CMEEC paid an extra $1,653 for Bilda's parents to fly to Kentucky.[21]

CMEEC also covered extra travel costs for Rankin's personal guest, including nearly $200 to ship her hat and glasses to the Derby.[22] All in all, the trip participants included just 4 CMEEC employees (including Rankin), just 7 of CMEEC's board members (including Bilda and Sullivan), and then 21 guests who held no position with CMEEC.[23]

### Trip to the Greenbrier in August 2015

Next there was a trip in August 2015 to the Greenbrier. The trip came about in July 2015 when Rankin sent an email to Sullivan, Bilda, and DeMuzzio. He explained that he was planning "to have a board strategic retreat in October at The Greenbrier in West Virginia. Prior to such, I thought it would be beneficial for the four of us to visit the place in August to check it out and craft the agenda."[24] He said that he wished to "share with you our 10 year strategic plan [for] an enhanced operating system" and suggested that they take a few days to "evaluat[e] the hotel and [golf] Course," with "more evaluation" to follow.[25] Bilda soon replied that, with one scheduling exception, "[e]verything else can be adjusted for something as important as this."[26]

---

[19] Tr. 1233–71.
[20] Gx561A; Tr.372, 3009–10, 3261, 3661, 3663–67, 3804.
[21] Gx322; Tr. 371–74, 3667.
[22] Gx325; Tr. 375.
[23] Gx561A, Gx561B. Many of the non-CMEEC guests were the spouse or partner of a CMEEC employee or board member.
[24] Gx330.
[25] Id.
[26] Gx331; Tr. 167.

A week later Rankin sent out another email confirming a four-day trip to the Greenbrier and noting the following golf course itinerary:

- Aug 4 Arrive
- Aug 5 The Old White, then The Greenbrier
- Aug 6 The Old White, then Oakhurst Links (1884 course where we use hickory sticks and era balls, with era outfits available)
- Aug 7 morning tour of bunkers, then fly home[27]

Rankin also added a link to the Greenbrier website: "You have to check this place out,,,,,,,,,,,,,,,,,,,,."[28]

In response to this itinerary, Sullivan replied: "Is your name 'I deserve a raise?'" Rankin responded: "I always like to think so :-) I thought we would love the historic nature of Oakhurst."[29]

A few days before the trip, Rankin sent out another email, reminding Sullivan, Bilda, and DeMuzzio that "[f]or the recreational activities, shorts and collared shirts are permitted, and we will have forecaddies as well." But he also suggested that for "dining and some bars, ... we [should] all bring a blazer, dress slacks, etc ... which will provide the full experience 😊."[30]

The foursome's trip to the Greenbrier cost more than $21,000 which Rankin billed to CMEEC.[31] The bill included more than $3,000 for airfare to West Virginia, including nearly $500 for seating upgrades.[32] It also included the foursome's dinner one night for $1,100 and then dinner a second night for $900.[33]

---

[27] Gx333. The Greenbrier offers tours of its underground bunker that was built in the Cold War era to house government functions in the event of a nuclear conflagration. Tr. 170.
[28] Gx333.
[29] *Id.*; Tr. 168–69.
[30] Gx336 at 1; Tr. 2636.
[31] Gx566 at 2; Tr. 2644, 3798.
[32] Gx335 at 14; Tr. 431.
[33] Gx346 at 13, 15; Tr. 3379–80.

Rankin's assistant—whose job was to make travel plans for CMEEC and to classify for accounting purposes the charges made by Rankin to the company's credit card—did not know about the trip before it occurred.[34] When Rankin submitted his credit card charges from the trip for her review, he told her the expenses were for the CMEEC compensation committee.[35]

The primary role of CMEEC's compensation committee was to determine the compensation and contract for Rankin as CEO.[36] But of the trip invitees only Bilda and DeMuzzio were members of this committee; neither Rankin nor Sullivan were members, and two other compensation committee members—Paul Yatcko and James Smith—were not part of the trip or invited.[37]

The government's evidence included records of votes and the minutes of board meetings that took place shortly before and shortly after the August 2015 trip to the Greenbrier.[38] These records showed no discussion of the Greenbrier or of Rankin's "10 year strategic plan" or an "entrepreneurial operating system" as referenced in Rankin's invitation email as the grounds for taking the Greenbrier trip in August 2015.[39] There was no documentary evidence of a post-trip report by the participants assessing the pros-and-cons of sponsoring a "board strategic retreat" at the Greenbrier.

### Trip to the Greenbrier in October 2015

Rankin next booked a larger group trip to the Greenbrier in October 2015. On this third trip, all the defendants but Sullivan attended.[40] Rankin advertised this trip as another company

---

[34] Tr. 313–15, 429.

[35] Tr. 431–32; Gx335 at 15, 17. Bilda submitted an expense reimbursement request to CMEEC that was classified in CMEEC records as "Greenbrier Comp Committee Meeting." Gx347 at 2; Tr. 3864. Bilda denied that he had described the expense as a compensation committee meeting. Tr. 3864–65.

[36] Tr. 163.

[37] Gx8; Tr. 165–66, 170–72, 184, 3091, 3365–66.

[38] Gx14; Gx15.

[39] Gx14 at 42–45, 52–53 (board meetings of July 23 and August 11, 2015); Tr. 4411–12.

[40] Gx562A. Sullivan had left his role at CMEEC prior to the October 2015 trip to the Greenbrier. Tr. 3287, 4129.

retreat.[41] But of the 23 guests, less than half were CMEEC employees or board members.[42] The

trip was never formally voted on at a board meeting.[43] Unlike with the Kentucky Derby trips,

however, there was evidence that this trip included two morning program sessions devoted to

CMEEC's business plans.[44] Yet Rankin later scheduled a "bunker tour" over one of these

sessions.[45]

Meanwhile, the trip participants spent over $30,000 on dining, shopping and recreation,

including over $2,000 on scarves for their guests' dates.[46] And there was plenty of golf. One

guest—an avid golfer who was a good friend of DeMuzzio's and former mayor of the City of

Groton but who had long since retired to Florida and who had no ongoing business ties with

CMEEC—testified that one of his more vivid memories was "making a birdie on the second

hole."[47]

CMEEC spent money on the spa and at a gun club.[48] And CMEEC rented another private

jet for the trip at a cost of more than $42,000.[49] In all, CMEEC paid over $109,000 for the

October 2015 trip to the Greenbrier.[50]

### Trip to the Kentucky Derby in 2016

The fourth trip was to the 2016 Derby. Most of this trip was paid for in May 2015 when

Rankin directed the purchase of 40 hotel/ticket packages for $284,960.[51] The 2016 trip involved

the same kinds of expenses for a private jet, limousines, high-end hotel, group dinner, and

---

[41] Gx348 at 1.
[42] Gx562B.
[43] Tr. 173; Gx15 (summary of board votes for 2015).
[44] Tr. 1395–96, 1421–26, 3391–94; Gx364 (PowerPoint used at October 2015 Greenbrier trip).
[45] Tr. 3393–94; Gx348; Gx363 at 2.
[46] Gx365 at 4; Gx370 at 1; Tr. 443–44.
[47] Tr. 1375–77, 1380–81, 1384–85, 1410, 1429, 3400–03.
[48] Gx365 at 10, 20.
[49] Gx566 at 3; Tr. 438.
[50] Gx566 at 3; Tr. 2645.
[51] Gx340; Gx372; Tr. 388–90.

premium Derby tickets as for the 2015 trip.[52] There were no business-related meetings or sessions during the 2016 Kentucky Derby trip.[53]

Because of a larger number of participants, the 2016 trip to the Kentucky Derby was more expensive than the 2015 trip, costing CMEEC nearly $375,000.[54] The trip participants included 4 CMEEC employees (including Rankin), 8 CMEEC board members (including Bilda and DeMuzzio), and 32 guests who held no position with CMEEC.[55] For example, two of the 2016 participants were the wife and mother-in-law of a board member who did not attend.[56]

### Planned trip to the Kentucky Derby in 2017

Just days after the 2016 trip to the Kentucky Derby, Rankin committed to buying a 40-ticket package to the 2017 Kentucky Derby for nearly $300,000.[57] But after news reports late in 2016 provoked a public scandal about the trips, the 2017 trip to the Kentucky Derby was cancelled.[58] The ticket package, however, was not fully refundable. CMEEC's only way to get money back was to try to sell the tickets.[59] CMEEC resold some of the tickets at a steep loss and recovered only $90,000.[60] So it was out more than $200,000 for this trip that never happened.[61] In all, CMEEC spent more than a million dollars on the five trips.[62]

---

[52] Gx566 at 4; Tr. 392–93.
[53] Tr. 1352, 1409.
[54] Gx566 at 4.
[55] Gx563A, Gx563B.
[56] Tr. 583–85.
[57] Gx426 at 1–2; Gx431 at 4; Tr. 425, 3086.
[58] Tr. 427, 3086–87, 3220–21.
[59] Tr. 3087–88.
[60] Tr. 2646–47.
[61] Gx566 at 5; Tr. 2647.
[62] Gx566 at 6.

### *Additional government evidence*

The government tried to show that the CMEEC board had not approved these trips. The trips were not discussed at or independently voted on at board meetings.[63] The government also tried to show that the defendants sought to conceal in whole or in part the details of these trips from those who were not invited or did not attend.[64] Sullivan, Bilda, and DeMuzzio did not seek approval from their respective member towns to attend these trips.[65] CMEEC's general counsel testified that either Rankin or Bilda asked him at some point in early 2016 for an opinion about whether the Kentucky Derby trips were "correct," but then they did not follow up with him.[66]

Rankin asked his secretary to not use the words "Kentucky Derby" to describe one of the trips, but instead write "strategic retreat."[67] And when he gave a news reporter a list of the names who attended the 2015 Kentucky Derby trip, he omitted five names including the names of Bilda's parents.[68] Similarly, in response to another request for a list of the persons who attended the October 2015 trip to the Greenbrier, Rankin sent a list that left off four names of persons who were not affiliated with CMEEC.[69]

### *The defense*

The defendants vigorously contested the government's evidence on cross-examination of the government's witnesses as well as during the presentation of their own defense case. Their

---

[63] Tr. 147–59, 324, 1831–32, 1573, 2061, 3270, 3814; Gx513 at 2. The evidence included all CMEEC board meeting minutes and votes from 2014 to 2017. Gx12–Gx15, Gx22–23.
[64] Tr. 328–20, 335–36, 920–21; Gx114; Gx115; Gx201A.
[65] Tr. 1474–80, 1486–87, 1534, 2327–2332, 2376–77.
[66] Tr. 2071–75, 2288–89. Bilda testified that this conversation occurred in late 2013 or early 2014 and that he asked the attorney if the trips were "okay" to which the attorney responded that "CMEEC can do what it wants with its money; it just might not look good in the newspaper." Tr. 3623–25.
[67] Gx201A; Tr. 2963–64.
[68] Gx564; Tr. 2567-68, 2623–24.
[69] Gx565; Tr. 2599–2600.

core defense throughout the trial was that the trips were "corporate retreats" that they reasonably believed served a legitimate business purpose.

They also tried to show that the trips (except for the small group trip of Rankin, Sullivan, Bilda, and DeMuzzio to the Greenbrier in August 2015) were known to all of the members of the board of directors because Rankin's invitations had gone to all of the members of the board of directors. They maintained that there was no requirement for a separate board vote on each trip and that each year's budget included line items for retreats that had been vetted and approved by CMEEC's budget committee.[70]

In addition, the defendants tried to show how some of the trip participants who were not CMEEC employees or board members were spouses or partners of CMEEC employees and board members or otherwise had some form of business relationship with CMEEC.[71] They further tried to show in the course of cross-examining CMEEC's in-house lawyers and outside accountants that they were aware of the trips but had not raised any concerns that they were fraudulent or unlawful.[72]

Rankin and Bilda both took the stand. They claimed that the trips were not vacations, but productive team-building retreats.[73] They testified that when Rankin began as CEO for CMEEC, the directors from the various member towns were not getting along because they were all looking out for their own towns rather than for CMEEC.[74] So beginning in 2013 Rankin

---

[70] *See, e.g.*, Tr. 1190, 2994–3000, 3038, 3079–80, 3123–24; Defendants' Exhibit ("Dx") 438 at 27; Dx430 at 37; Dx432 at 12; Dx449 at 22.

[71] *See, e.g.*, Dx668; Tr. 3009–12, 3068, 3672–80.

[72] *See, e.g.*, Tr. 1697, 1704, 1755–1771, 1783–85, 1795. The outside auditor testified that he was not aware of trips to the Greenbrier. Tr. 1809–10. And he testified that he was not aware of non-CMEEC persons such as a bartender or in-laws of a board member attending the Kentucky Derby trips. Tr. 1812.

[73] *See, e.g.*, Tr. 2818–19, 3127, 3634–35, 3689, 4200–02. Similarly, the defendants brought out through questioning of other witnesses their participation in or knowledge of corporate retreats held at out-of-state resorts. *See, e.g.*, Tr. 1930–36.

[74] Tr. 2804, 2810–11, 3577–79, 3591–94, 3689–90.

organized annual trips to the Kentucky Derby to bring the board together.[75] No one on the board or at CMEEC told him he should not do these trips or incur expenses like for a chartered jet, limousines, a high-end restaurant, or premium Derby tickets.[76] And Rankin maintained that his plan worked because he heard positive feedback from the directors and saw them "form[ ] a much more constructive union and relationship."[77]

Similarly, Bilda testified that the CMEEC "retreats" helped improve board relations, because "[p]eople began to know one another better," and "the board meetings were functioning much better."[78] Notwithstanding the lack of formal programming, Rankin and Bilda attested that they were talking about work much of the time during the trips.[79] Rankin and Bilda also testified that the retreats greatly improved CMEEC's profits.[80]

Rankin denied any intent to conceal the trips. He had invited all of CMEEC's directors to the Kentucky Derby.[81] The invitation even mentioned many of the luxurious details, like the private jet.[82] Rankin testified that after each trip to the Kentucky Derby the feedback he received from board members was "[o]verwhelming positive support and encouragement to do it again."[83]

According to Rankin, he believed he was acting at the direction of the board and that he did not intend to misappropriate any CMEEC money.[84] Bilda testified to the same effect—that

---

[75] Tr. 2945–47.
[76] Tr. 3007, 3041–42, 3053–54, 3060, 3108, 3612. On cross-examination, Rankin conceded that an accounting employee expressed a concern to him about the "image" of the trips. Tr. 3274–75.
[77] Tr. 2819–20.
[78] Tr. 3620.
[79] Tr. 3101, 3616–18, 3659.
[80] Dx1277; Tr. 3152–55; Tr. 3222.
[81] Tr. 76, 4202, 4334.
[82] Gx306 at 4; Tr. 229.
[83] Tr. 3085.
[84] Tr. 3226.

he believed the trips served CMEEC's business purposes, that "no one was putting up red flags," and that he did not intend to misappropriate any funds.[85]

Rankin acknowledged that invitees would drop out "sometimes late in the phase" which "created vacancies" for other invitees and that he "could have handled that differently."[86] Bilda testified that his parents joined the 2015 Kentucky Derby trip because it was a "bucket-list kind of trip" for them.[87] Because his parents were invited only after there was a last-minute opening, he thought the tickets would otherwise "go to waste" and that "CMEEC would still bear the expense" even if his parents did not join the trip.[88]

On cross-examination, Bilda was asked about his testimony at a town hearing in 2017 after the scandal had broken about the trips when he was asked if he had brought any guests to the 2015 Kentucky Derby trip and when he replied that he had brought his wife as a guest but did not mention his parents.[89] When asked why he did not mention his parents, Bilda replied that "[m]y wife was my guest," but that "[m]y parents [were] CMEEC's guests," because "Drew Rankin said go ahead and invite them."[90]

For the August 2015 trip to the Greenbrier, Rankin testified that he had previously visited the Greenbrier.[91] He testified that he decided to bill this trip to the compensation committee because "the idea originated inside the compensation committee when we were meeting."[92] Both Rankin and Bilda denied that Rankin's compensation was ever discussed during the trip.[93] Instead, according to Rankin, he devoted "35 to 40 hours" during the August 2015 trip to talking

---

[85] Tr. 3688–92.
[86] Tr. 2836–37, 3010.
[87] Tr. 3666.
[88] Tr. 3873; *see also* 3666–67.
[89] Tr. 3777–79.
[90] Tr. 3778.
[91] Tr. 3214.
[92] Tr. 3094.
[93] Tr. 3095, 3647.

with Sullivan, Bilda, and DeMuzzio about "the ten-year strategic plan and the entrepreneurial operating system."[94]

The defendants stressed that many other companies sponsored corporate retreats, including retreats to the Kentucky Derby and the Greenbrier.[95] A witness from the Greenbrier was called to testify that it was common for companies to hold retreats there and for there to be an advance "site visit" by the planner or planners of a retreat.[96] One of CMEEC's consultants who attended some of the trips and was paid by CMEEC to enhance executive leadership and team-building testified about why he thought the trips served a valid business purpose.[97]

As will be discussed in more detail below, the trial also included evidence related to the statutory requirement of § 666 that the entities whose money was used to finance the trips have received more than $10,000 in federal benefits in the relevant calendar year. There was testimony and documents to show that CMEEC had received benefits from the U.S. Department of Energy in 2014 and 2015. And there was also testimony and documents that two of the member towns—Norwich and Groton—had received more than $10,000 in benefits from other federal sources.[98]

### The verdict

The case ultimately went to the jury on three of the four counts that had been charged in the indictment:

---

[94] Tr. 3101; *see also* Tr. 3095 (Rankin testimony that topics of discussion were "[t]he EOS model, exhaustively, board roll-out, board concerns, board stakeholder management, as well as review [of] the facility"); Tr. 3213 (Rankin testimony that the "purpose" of the August 2015 Greenbrier trip "was to gain the three key board members' insights to the EOS model, the receptivity of the balance of the members to that bold of a type of operating model, to get their ideas on who to have at the session, how to roll it out to them, and just leverage their full experience in that regard"); 3505–06 (Rankin testimony that the group of four spent "about 40 hours of focused time" during the Greenbrier trip discussing CMEEC business); Tr. 3659 (Bilda testimony that CMEEC's "ten-year strategic plan" and "other stuff related to CMEEC" was discussed "at dinner" and "at the plane").
[95] Tr. 3060, 3508–11, 3640–43.
[96] Tr. 3507–13.
[97] Tr. 3883–3917.
[98] Tr. 4176–79.

- Count One charged all five defendants with a conspiracy to violate § 666 from 2014 to 2017.[99]

- Count Two charged all five defendants with misappropriation in violation of § 666 for the calendar year 2014. This count was based solely on alleged misappropriations that took place in 2014 for prepayments made by CMEEC for the Kentucky Derby trip that occurred in 2015.[100]

- Count Three charged all five defendants with misappropriation in violation of § 666 for the calendar year 2015. This count was based on alleged misappropriations including payments made in 2015 for the trips to the 2015 Kentucky Derby, payments made in 2015 for the two trips to the Greenbrier in August 2015 and October 2015, and prepayments made in 2015 for the trip to the Kentucky Derby in 2016.[101]

Near the end of the trial, I granted the government's motion to dismiss Count Four which alleged a misappropriation in violation of § 666 for the calendar year 2016.[102] This count was based on payments made in 2016 for the 2016 trip to the Kentucky Derby as well as for non-refunded prepayments made in 2016 for the cancelled trip to the Kentucky Derby in 2017. The government dismissed this count after acknowledging concerns that it could not survive because it was improperly pleaded in the indictment.[103]

For the remaining three counts, the jury returned a mixed verdict that was mostly favorable to the defendants. It acquitted all five defendants of Count One (conspiracy) and of

---

[99] Doc. #478 at 13 (jury instructions).
[100] *Id.* at 7–10.
[101] *Ibid.*
[102] Doc. #463; *see* Doc. #1-1 at 18–19 (¶¶ 66–67).
[103] Tr. 3306, 3426–27. Section 666 requires that a defendant be an agent of the same entity from which he has misappropriated funds and which has received $10,000 or more in funds per calendar year. As the government acknowledged, Count Four was defectively pleaded because it alleged that the defendants were agents of CMEEC member towns but that they misappropriated property belonging to or in the care, custody, or control of CMEEC rather than any CMEEC member towns. Doc. #1-1 at 19 (¶ 67).

Count Two (misappropriation in 2014). But it convicted Rankin, Bilda, and Sullivan of Count Three (misappropriation in 2015), while acquitting DeMuzzio and Pryor on that count.[104]

I also posed special interrogatories to the jury to clarify the basis for their verdict. The jury concluded that CMEEC received more than $10,000 in federal benefits in 2015.[105] And the jury also concluded that CMEEC—rather than any of the relevant member towns—both owned and had care, custody, and control of the property that was misappropriated.[106]

## DISCUSSION

### A. Motions for judgment of acquittal

The defendants Rankin, Sullivan, and Bilda move for a judgment of acquittal.[107] Rule 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In considering the defendants' challenge, I must review the evidence in the light most favorable to the government, and I must sustain the verdict if any rational trier of fact could have found the evidence was sufficient to sustain the jury's verdict. *See United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018).[108]

### 1. Sufficiency of evidence of federal benefits

The defendants first and primarily argue that the evidence was not enough to show that CMEEC received more than $10,000 in federal benefits in 2015.[109] Section 666 includes a jurisdictional element that requires proof that a defendant engaged in an intentional

---

[104] Doc. #485 at 1–3.
[105] *Id.* at 3.
[106] *Id*. at 4.
[107] The defendants filed a mid-trial motion for judgment of acquittal at the close of the government's case-in-chief (Doc. #439), orally renewed their motion for judgment of acquittal at the close of all the evidence (Doc. #466), and filed a post-trial motion for judgment of acquittal (Doc. #551).
[108] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.
[109] Doc. #551-1 at 2–23.

misappropriation of funds from an "organization, government, or agency [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." § 666(b).

The trial evidence showed that CMEEC and five of its member municipal utilities applied in 2010 for a federal grant from the U.S. Department of Energy (DOE).[110] The DOE administered a federal grant program known as the Smart Grid Investment Grant Program.[111]

The CMEEC proposal for a "ConnSMART Program" was for federal funding "to continue the process of enabling smart grid functions to shift load out of critical peak periods, thereby reducing power costs for customers of the municipally owned utilities of the state."[112] Toward this end the proposal sought funding for the municipal utilities to install thousands of "smart" electric meters to track when customers were drawing power, and then the utilities could use this data to reward customers for drawing power during off-peak hours.[113] Meanwhile, CMEEC would use the data from smart meters to inform its wholesale power purchases for its municipal electric utilities.[114]

CMEEC was the "lead applicant" and "primary awardee" for a multi-year grant in a total amount of $9,188,050.[115] But CMEEC and the members did not get any federal money immediately. They first had to spend their own money on the project, and then they could ask for reimbursements.[116] The DOE routed these reimbursements through CMEEC. Thus, every month

---

[110] Gx40 at 211, 268; Dx466 at 1–2; Tr. 955, 957. Although some of the exhibits that I rely on to deny the defendants' Rule 29 motion were introduced as defense exhibits, they were introduced during cross-examination of the government's witnesses during the government's case-in-chief, and therefore they may properly be considered for purposes of evaluating the Rule 29(a) motion.

[111] Tr. 925–26.

[112] Dx466 at 2 (proposal for Connecticut Municipal Utilities Smart Grid Project); Gx40 at 154 (project objectives).

[113] Dx466 at 2–3.

[114] *Ibid.*; Tr. 965–66.

[115] Tr. 939–40, 955, 981–82; Gx40 at 166, 211, 268.

[116] Tr. 935, 942–43.

or so, CMEEC collected the members' ConnSMART bills and bundled them with its own bills into a single reimbursement drawdown request. After the DOE approved the request and sent CMEEC the money, CMEEC sent each member its share of the reimbursements.[117]

The last reimbursement under the ConnSMART grant was in early 2015. On February 17, 2015, CMEEC asked the Department for $864,154 in reimbursements based on ConnSMART expenses that were incurred in late 2014.[118] Identifying itself as the "prime recipient" for the grant, CMEEC sought $9,363 for itself as well as $854,791 for its "subrecipient" members.[119]

On March 31, 2015, the DOE approved the request and transmitted $864,154 to CMEEC.[120] Then CMEEC in turn sent its participating members the $854,791 that was allocated for them.[121] After that, the ConnSMART grant ran out.[122]

I instructed the jury at length on the federal benefits jurisdictional requirement. First, I instructed the jury that "[t]he prosecution must prove that CMEEC received federal benefits in excess of $10,000 during the relevant calendar year."[123] I further instructed "as a matter of law that the federal ConnSmart program involving the federal Department of Energy qualifies as a federal benefit program."[124]

I then went on to instruct the jury that "the fact that CMEEC received payments that originated from a federal government benefit program is not enough by itself to conclude that CMEEC received federal benefits."[125] Instead, the jury "must consider whether the payments

---

[117] Tr. 943–44, 1156; Gx40 at 273.
[118] Dx523 at 1–4.
[119] Dx523 at 4; Tr. 1004–05.
[120] Tr. 1015–16, 1027; Gx101 at 55.
[121] Gx100A at 365; Tr. 1164.
[122] Gx40 at 273; Tr. 1004.
[123] Doc. #478 at 12.
[124] *Ibid*.
[125] *Ibid*.

were a benefit to CMEEC as distinct from any benefit derived by other recipients of federal

funds" and that "[i]n making this evaluation you may consider whether payments of federal

funds passed through another intermediary entity prior to receipt and whether payments were

passed on to another entity or person."[126]

The jury was also told of the statutory exemption under § 666(c) for "*bona fide* salary,

wages, fees, or other compensation paid or expenses paid or reimbursed in the ordinary course of

business."[127] I told the jury that "[p]ayments made for this purpose do not qualify as federal

benefits and do not count toward the $10,000 or more federal benefit requirement."[128]

Lastly, I instructed the jury that "[i]f a payment constitutes a benefit, then it is a benefit as

of the date that the payment was received by CMEEC," and that "[t]he date that the federal

payment was received determines what calendar year it was received."[129] I further instructed the

jury that "[i]t is not relevant for determining the date of receipt whether the payment was in the

nature of a reimbursement for prior funds expended or a credit for future funds to be

expended."[130]

Against all this background, I understand the defendants to raise three somewhat

overlapping challenges to the sufficiency of the evidence to show that CMEEC received more

than $10,000 in federal benefits in 2015. First, they challenge the sufficiency of evidence to

show that CMEEC—as distinct from its municipal grant partners—was a recipient in 2015 of

any federal benefits at all. Second, assuming that CMEEC received any federal benefits, they

challenge the sufficiency of evidence to show that CMEEC received more than $10,000 in

---

[126] *Ibid.*
[127] *Ibid.*
[128] *Ibid.*
[129] *Id.* at 13.
[130] *Ibid.*

benefits in 2015. Third, they argue that—as a matter of law—the DOE payment transmitted to CMEEC in 2015 was not a benefit that was received in the year 2015. I will consider each challenge in turn.

The defendants' first argument is that the evidence did not suffice to show that CMEEC received *any* federal benefits in 2015. Their argument raises the thorny issue of what constitutes a "benefit" within the meaning of § 666. Although § 666 does not itself define this term, the Supreme Court's decision in *Fischer v. United States*, 529 U.S. 667 (2000), elaborates on how courts should evaluate whether federal payments to a local government entity qualify as "benefits" under § 666.

As an initial matter, the Supreme Court in *Fischer* made clear that not all federal payments qualify as benefits under § 666. It observed that "[a]ny receipt of federal funds can, at some level of generality, be characterized as a benefit," but "[t]he statute does not employ this broad, almost limitless use of the term." *Id.* at 681.

The Supreme Court then described what separates a mere federal *payment* from a federal *benefit* within the meaning of § 666(b). It instructed that "[t]o determine whether an organization participating in a federal assistance program receives 'benefits,' an examination must be undertaken of the program's structure, operation, and purpose," and "[t]he inquiry should examine the conditions under which the organization receives the federal payments." *Ibid.*; *see also United States v. Bahel*, 662 F.3d 610, 629 (2d Cir. 2011) (federal payments to the United Nations were "benefits" because "funding to the U.N. is not merely payment for goods and services provided to the United States" but instead "fulfills significant purposes beyond [the] performance of an immediate transaction, including the advancement of policy goals"); *United States v. Rooney*, 986 F.2d 31, 35 (2d Cir. 1993) ("The inquiry is … whether the funds disbursed

can be considered Federal assistance within a specific statutory scheme intended to promote public policy objectives and not payments by the government as a commercial entity.").

Importantly, the Supreme Court in *Fischer* also made clear that a federal payment may constitute "benefits" to *more than one person or entity* and that the characterization of a payment as a "benefit" to any particular recipient may turn in part on the identity and role of the recipient. At issue in *Fischer* was whether Medicare payments to a hospital for patient care qualified as "benefits" not only to patients but also to the hospital itself. Rejecting the argument that only patients receive "benefits" from the Medicare program, the court noted the fact "[t]hat one beneficiary of an assistance program can be identified does not foreclose the existence of others, however." *Id.* at 677. The court went on to evaluate the nature and purpose of the Medicare program and concluded that its purpose in part was to benefit health care providers such as hospitals: "The payments are made not simply to reimburse for treatment of qualifying patients but to assist the hospital in making available and maintaining a certain level and quality of medical care, all in the interest of both the hospital and the greater community." *Id.* at 679–80.

The Supreme Court in *Fischer* also noted that it "must construe the term 'benefits,' … in a manner consistent with Congress' intent not to reach the enumerated class of transactions" specified under the exemption provision of § 666(c). *Id.* at 679. This provision "removes from the statute's coverage any 'bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.'" *Id.* at 678 (quoting § 666(c)). The court rejected the argument that the Medicare payments at issue were for "the limited purposes of compensating providers or reimbursing them for ordinary course expenditures" within the meaning of § 666(c). *Id.* at 679.

21

As I see it, the evidence was sufficient for the jury to conclude that the federal payment to CMEEC in 2015 qualified as "benefits" specifically to CMEEC (in addition to any "benefits" received by CMEEC's subrecipient grant partners).[131] The payments funded the ConnSMART project, and CMEEC had a keen interest in ConnSMART's success. CMEEC identified itself as "the lead applicant" for the grant and as the "joint action agency" of its member utilities "for energy forecasting and power purchasing."[132] It did not identify itself as a mere passive recipient or disinterested conduit for federal benefit payments.

Most of the federal funding for ConnSMART—including more than $800,000 of equipment purchases from the 2015 payment—was used for smart meters in the member towns.[133] And a main purpose of those meters was to help CMEEC, because CMEEC vouched that it planned to use data from the meters to "*enhance ongoing wholesale power purchasing and forecasting.*"[134] CMEEC's project execution plan further described a purpose of the federal grant

---

[131] Because *Fischer* decided the "benefits" issue as a matter of law, it could be argued that I erred by even instructing the jury to decide if any payments to CMEEC were "benefits." *See United States v. Insaidoo*, 765 F. App'x 522, 525 (2d Cir. 2019) (noting that "the determination of whether a [statute's] structure, operation, and purpose establishes a federal program that provides benefits was not a question for the jury" and noting that "the government only had to prove that [the organization] received more than $10,000 in federal funds in a one-year period between 2007 and 2017"); *United States v. Briston*, 192 F. App'x 84, 88 (3d Cir. 2006) ("The determination of whether funds provided under a specific federal program constitute 'benefits' for the purpose of 18 U.S.C. § 666(b) neither requires nor allows a case-by-case factual inquiry by a jury."); *but see United States v. McLean*, 802 F.3d 1228, 1247 (11th Cir. 2015) ("However, based on our circuit precedent, if we were to address this issue, we would determine that the decision to classify assistance as a federal benefit was properly submitted to the jury."). Although I decided to instruct the jury as a matter of law that the ConnSMART grant program as a whole was a federal benefit program, I concluded that the jury had a proper fact-deciding role on the subsidiary issue of whether the payments constituted benefits specifically to CMEEC in light of *Fischer*'s statement that "[t]he inquiry should examine the conditions under which the organization receives the federal payments." 529 U.S. at 681. I also concluded that there were fact issues for the jury to resolve with respect to whether the exemption under § 666(c) negated a conclusion that the payments were benefits to CMEEC. If I did err by allowing the jury a role, the defendants cannot complain because they agreed with me during the charge conference that it is "for the jury to determine whether [a] particular payment or line of credit constituted a federal benefit under the purposes of that program." Tr. 4025. And any possible error was harmless in light of the undisputed fact that CMEEC received $864,154 in federal funds in 2015 and that these funds as a matter of law emanated from what the defendants themselves conceded *writ large* is a federal benefits program. Tr. 4022, 4024–25.
[132] Dx467 at 8–9; *see also id.* at 28 (describing CMEEC as the "shared power purchasing agency" of the member electric utilities).
[133] Dx523 at 4 (showing $831,227.53 for equipment purchases, mostly for meters as well as for software).
[134] Dx467 at 7 (emphasis added); Tr. 966 (defense counsel reading this passage to the jury); *see also* Tr. 2760 (government argument that the "benefit" to CMEEC from "the smart grid program is helping all of the towns and

to "lower the cost of power through a) reduced peak capacity and peak transmission wholesale charges and b) *improved bulk power purchasing, enabled by improved load forecasting*."[135]

Thus, viewing the evidence as I must in the light most favorable to the jury's verdict, I conclude that the jury could reasonably have decided that CMEEC—as the members' bulk purchasing agent for electric power—benefitted from the *entire* smart grid project, including the parts run by the member towns that in turn enhanced CMEEC's ability to engage in wholesale power purchasing. Indeed, because CMEEC is a cooperative owned by its municipal members, the jury reasonably could have inferred that the benefits to the members from smart grid technology reciprocally redounded to the benefit of CMEEC as their self-described "joint action agency."[136]

It makes no difference that the benefits were also received or jointly shared by CMEEC's municipal grant partners. The defendants conceded at oral argument "that in a theoretical case" an entity could benefit "as a result of funding that went to a third party."[137] And as the Second Circuit has observed, "[n]othing in the language of § 666 suggests that its reach is limited to organizations that were the direct beneficiaries of federal funds," and "[n]othing in this language suggests that § 666 does not reach thefts by an agent of an organization that receives federal program moneys and administers those moneys for the benefit of program beneficiaries." *United States v. Zyskind*, 118 F.3d 113, 116 (2d Cir. 1997); *see also Fischer*, 529 U.S. at 677 ("That one beneficiary of an assistance program can be identified does not foreclose the existence of

---

CMEEC manage their energy load and flow").
[135] Dx467 at 12 (emphasis added).
[136] This is consistent with the government's closing argument that "CMEEC applied for the smart grant on behalf of the MEUs [municipal electric utilities]," that "CMEEC was the entity that is going to receive the money," and that "CMEEC is also getting a benefit," because there is a benefit "when CMEEC and the MEUs have a more efficient grid" and "when they have more efficient delivering of power." Tr. 4177–78. "CMEEC exists to help the MEUs work together by purchasing and managing the provisions of electricity," and "so if it helps the towns, it helps CMEEC; if it helps CMEEC, it helps the towns." Tr. 4178.
[137] Doc. #566 at 17–18.

others …"). The evidence was enough to show that the funds received by CMEEC in 2015 were "benefits" to CMEEC within the meaning of § 666.

The defendants further argue that the evidence was not enough to show that CMEEC received more than $10,000 in benefits in 2015. This is a tough argument to make because CMEEC ultimately received more than $800,000 from the DOE in 2015. Nevertheless, the defendants rely on the fact that CMEEC immediately redistributed the vast majority of the payment it received in 2015 to its grant partners and retained only $9,363 for itself.

But the fact that CMEEC did not end up keeping more than $10,000 is not dispositive. What the statute requires is that a local government entity *receive* more than $10,000 in federal benefits, not that it *retain* more than $10,000 in federal benefits. Given the purpose in part of the ConnSMART grant was to facilitate CMEEC's wholesale power purchasing operations by enabling CMEEC's grant partners to install smart meters, a reasonable jury could have concluded that CMEEC itself received more than $10,000 of benefits from the more than $800,000 in payments that flowed through CMEEC to its grant partners for the installation of smart meters. The jury was not required to tabulate an exact or precise dollar-figure of "benefit" that CMEEC received. It could reasonably and rationally have concluded that CMEEC's benefit was more than $10,000.

And because the jury could reasonably have concluded that CMEEC received more than $10,000 in benefits from the *entire* federal payment that it received of $864,154, I need not consider the defendants' argument that the particular $9,353 retained by CMEEC was itself not a "benefit" or otherwise subject to the statutory exemption under § 666(c). In short, viewing the evidence in the light most favorable to the government, the evidence was enough for a

reasonable jury to conclude that the benefits received by CMEEC in 2015 were more than $10,000 as required under § 666.

The defendants further argue that—as a matter of law—the benefits that CMEEC actually received by means of a payment in 2015 are *not* allocable to the calendar year 2015. Instead, according to the defendants, CMEEC received the benefits as early as 2010 when it won the multiyear ConnSMART grant or, at the latest, it received the benefits in 2014 when CMEEC and its municipal grant partners incurred the expenses that were later reimbursed by the federal government in 2015.[138]

This argument is not persuasive. Starting with the words of the statute, they refer to a local government entity that "*receives*, in any one year, benefits in excess of $10,000." 18 U.S.C. § 666(b) (emphasis added). The word "receives" in this context implies some form of *transfer* of federal benefits. When the federal government pays benefits to a local government entity, the local government entity "receives" the benefits at that time. The statute does not otherwise refer to the date when the payment of benefits was first promised or the date when qualifying expenses occurred to warrant a later reimbursement payment.

The defendants rely on *United States v. Kranovich*, 401 F.3d 1107 (9th Cir. 2005), in which the Ninth Circuit ruled that a local government "received" the "benefits" of a federal grant at the time that the grant was awarded, even though the grant funds had yet to be distributed. *Id.* at 1112. But in deciding that a local government agency "receives" federal funds in the year when the funds are announced or awarded, the Ninth Circuit "recognized that section 666(b) should be interpreted broadly." *Ibid.* And so it declined to accept a defendant's argument that the statute applied *only* to the misappropriation of funds in the years that such funds were actually

---

[138] Doc. #551-1 at 23–26.

paid out to the local government. In other words, the Ninth Circuit had no occasion to decide the issue presented here: whether a local government "receives" federal benefits in the year when the federal government actually pays them.

If—as the defendants suggest—*Kranovich* stands for the proposition that a local government agency only "receives" federal benefits as of the day when the award of future payment of benefits is announced, this cannot be squared with the broad purpose of § 666 to deter the defalcation of funds from local government entities that receive federal benefits on an ongoing basis. As the Supreme Court has recognized, "the language of [§ 666(b)] reveals Congress' expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs." *Fischer*, 529 U.S. at 678. Congress has authority "to see to it that taxpayer dollars appropriated … are in fact spent for the general welfare, and not frittered away … when funds are siphoned off." *Sabri v. United States*, 541 U.S. 600, 605 (2004). This interest endures regardless of the date when such funds were first promised to be paid by the federal government.

Suppose, for example, that a city wins a federal grant that promises to pay millions of dollars a year for the next decade. The federal government plainly has an interest in deterring theft for each one of the years that it keeps funding the city. But as the defendants would have it, Congress intended to protect the federal government's interest for the first year only, leaving no federal remedy against embezzlers and thieves who may steal the city blind year after year thereafter as the city continues to receive periodic payments of federal benefits. This interpretation is inconsistent with common sense as well as the text and purpose of § 666.

As for the defendants' fallback argument that the controlling date should be when CMEEC and its municipal grant partners incurred reimbursable expenses, the statute refers to

"benefits … *under a Federal program* involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." § 666(b) (emphasis added). These words suggest that the term "benefit" is gauged by reference to the resource that the federal government dispenses, rather than by reference to what goods or services that a grantee may choose to purchase in anticipation of receiving federal reimbursement. The statutory text and common sense weigh against the defendants' argument that the timing of CMEEC's receipt of benefits turns on when CMEEC or its partners chose to engage in potentially reimbursable expenditures rather than on when CMEEC actually received a reimbursement benefits payment from the federal government.

The words of § 666 are most naturally read to suggest that a local government entity "receives" federal benefits on the date when the federal government transfers the benefit to the local government entity. Could the statute be read even more broadly also to apply to the year when federal benefits are initially promised (*Kranovich*) or to the year when a grantee fulfills the conditions precedent for payment? Maybe or maybe not. At its core, however, the statute unquestionably applies to the year when the local government actually "receives" a payment of federal benefits. And that is enough to decide and deny the defendants' argument here.

All in all, the evidence was sufficient to support the jury's verdict on the federal jurisdictional element that CMEEC received $10,000 or more in federal benefits in 2015. Accordingly, I will deny the defendants' motion for judgment of acquittal as to this element.

### 2. *Sufficiency of evidence regarding approval of board*

The defendants next argue that there was insufficient evidence of their criminal intent because the trip expenses were budgeted and approved by the CMEEC board of directors.[139] But

---

[139] *Id.* at 27–33.

even if the defendants are right that the CMEEC board—through its budget committee—approved annual budgets that included line items for board retreats, the evidence amply showed that the trips themselves were not discussed at any of the board meetings and that not all board members were aware of the full range of expenses and non-CMEEC-affiliation of many of the trip invitees for the 2015 Kentucky Derby trip.[140] For example, Sullivan invited his brother, his sister-in-law, and his son as well as his bartender and a friend of his bartender—all at CMEEC expense. And Bilda invited his parents—again, at CMEEC expense. Rankin organized the 2015 trip and knew that the trip would include Sullivan and Bilda's family and friends who had no affiliation with or contribution to the work of CMEEC. There was no evidence to suggest that the board was presented with and approved the inclusion and financing for persons (other than spouses or significant others) who were not employed with or affiliated with CMEEC.

Indeed, there was no evidence at all to suggest that the full board knew about—much less approved of—the golfing trip by Rankin, Sullivan, Bilda, and DeMuzzio to the Greenbrier in August 2015. The jury could well have based its guilty verdict against the defendants on that one trip alone.

Moreover, even if the defendants were right that the full board approved the trips, the defendants are wrong to claim that this would necessarily negate the government's theory of wrongdoing or criminal intent: "If all the officers and directors become a party to a scheme to use corporate assets improperly, the resulting injury to the entity and its owners—the shareholders—is no less than when only some of the officers are involved," because "[o]fficers and directors do not have a license to plunder corporate treasuries acting individually or collectively." *United States v. Wallach*, 935 F.2d 445, 468–69 (2d Cir. 1991). Accordingly, to the

---

[140] The government's briefing more fully describes how there was a factual basis for the jury to conclude that the board did not knowingly approve the trips. Doc. #553 at 51–53.

extent that the defendants argue that the board's approval negated their criminal intent, I will deny the defendants' motion for judgment of acquittal.

### 3. *Sufficiency of evidence of intentional misappropriation of more than $5,000 of CMEEC property in 2015*

The defendants next challenge the jury's finding that they intentionally misappropriated more than $5,000 of property from CMEEC in 2015.[141] This argument hinges on the defendants' supposition that "in convicting only Messrs. Rankin, Sullivan, and Bilda solely on Count Three, the jury must have taken the government's invitation to find guilt as a result of substitute guests who attended the 2015 Kentucky Derby retreat" and that there was insufficient evidence that more than $5,000 was collectively spent in 2015 for substitute guests—such as Sullivan's bartender and Bilda's parents—who took spots that had been prepaid by CMEEC in 2014.

The government disagrees, primarily arguing that the jury could validly have taken into account the inclusion of personal guests as powerful evidence that the *entire* reason for the trip expenses incurred in 2015 for the Kentucky Derby was for purely personal reasons rather than for any legitimate business purpose.[142] But I do not need to take sides in this dispute, because the evidence was easily enough for the jury to convict the defendants solely on the basis of their small group trip to the Greenbrier in August 2015.

This trip cost more than $21,000 and involved only Rankin, Sullivan, Bilda, and DeMuzzio. The exchange of pre-trip emails—as I have recounted in the background section above—strongly suggested that it was a personal golf vacation. Notwithstanding Rankin's fleeting reference in his initial invitation email about his desire to talk to Sullivan, Bilda, and DeMuzzio about his ten-year strategic plan and his entrepreneurial operating system, the jury

---

[141] Doc. #551-1 at 33–39.
[142] Doc. #553 at 58.

could have concluded that this discussion might just as easily have taken place in Connecticut and that the real reason for the trip was personal and not to talk about any ten-year plan or a new operating system.

The jury could have viewed Bilda's immediate reply—that "[e]verything else can be adjusted for something as important as this"—as a tongue-in-cheek response welcoming an opportunity to visit a luxury resort at corporate expense. And it could have viewed Sullivan's later response—"Is your name 'I deserve a raise?'"—to Rankin's description of the golfing opportunities as similarly reflecting his interest in taking a trip for personal vacation purposes. The jury could have doubted that Rankin had any corporate purposes in mind when he replied to Sullivan's "I deserve a raise" email by praising the "historic nature of [the] Oakhust [links]" rather than expounding on his ten-year vision for CMEEC's future success.[143]

Similarly, the jury could well have doubted the need for Rankin, Sullivan, Bilda, and DeMuzzio to have engaged in any kind of an in-person site visit. There was no evidence of a post-trip report or presentation to the board about the alleged "evaluation" of the suitability of the Greenbrier for a corporate retreat. The foursome spent more than $2,000 for just two dinners at the Greenbrier. A reasonable jury could have concluded that these lavish dinner expenses—in conjunction with the focus of the itinerary plans on the Greenbrier's many golf courses—was indicative that the entire trip was simply a personal vacation and not for any valid corporate purpose.

On top of all this, a reasonable jury could have concluded that Rankin's misbilling of the trip as a compensation committee meeting was an intentional effort to obfuscate the lack of any genuine corporate purpose for a $21,000 golfing vacation to the Greenbrier resort. Nor was there

---

[143] Gx333.

any evidence to suggest that the CMEEC board knew or approved of the August 2015 trip to the Greenbrier.

I have evaluated above the sufficiency of the evidence solely by reference to evidence presented in the government's case-in-chief. *See* Fed. R. Crim. P. 29(a). But if I also consider the additional evidence introduced during the defense case, it just gets worse for the defendants. The jury learned from Rankin that he had been to the Greenbrier before, so it could have concluded there was no real reason for him to make a return "scouting" trip to the Greenbrier in August 2015. The jury could easily have disbelieved the implausible and uncorroborated testimony of Rankin and Bilda that they devoted as many as 40 hours during their Greenbrier trip in August 2015 to discussing CMEEC's business affairs such as the proposed entrepreneurial operating system. The jury could have wholly discounted Rankin's far-fetched claim that the reason he misbilled the Greenbrier trip as a compensation committee event was because he had first thought of doing the trip during a meeting with the compensation committee.

Of course, as the defendants note, DeMuzzio also took part in this trip but he was not convicted. Yet there are plenty of reasons why the jury might have spared DeMuzzio. For one thing, he did not write emails like those of Bilda and Sullivan betraying his eagerness to venture to the Greenbrier. He was also a volunteer board member who had an outstanding record of attendance at board meetings.[144] And his lawyer kept reminding the jury that DeMuzzio was 80 years old and had been a rescue pilot for the United States Coast Guard.[145]

In any event, there is no need to try to read the tea leaves of the jury's verdict, because "[i]nconsistency in a verdict is not a sufficient reason for setting it aside." *United States v. Pierce*, 940 F.3d 817, 822 (2d Cir. 2019). So whatever reason that the jury may have spared

---

[144] Tr. 490, 497–99.
[145] Tr. 66, 1413.

DeMuzzio, the remaining evidence about just the August 2015 trip to the Greenbrier was easily enough to prove that Rankin, Sullivan, and Bilda intentionally misappropriated more than $5,000 of CMEEC's property in 2015. Accordingly, to the extent that the defendants argue that the evidence was not sufficient to show that they intentionally misappropriated more than $5,000 of CMEEC's property in 2015, I will deny their motion for judgment of acquittal.

### 4. *Due process right to fair notice*

The defendants next argue that their convictions violated due process because they lacked fair notice that their trips were illegal. They insist that "[n]o officer or senior employee of CMEEC could have contemplated criminal prosecution for planning or attending corporate retreats that were budgeted, approved, and known to the CMEEC board."[146]

The Constitution's due process clause does not allow a defendant to be convicted if the defendant did not have fair notice that what the defendant did was a violation of criminal law. As the Supreme Court has explained, "because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The "touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

The defendants here do not complain that there is anything about the words of § 666 that failed to give them fair notice.[147] Instead, they make an as-applied argument that they did not

---

[146] Doc. #551 at 40.

[147] To the extent that the defendants have contested the interpretation of § 666's jurisdictional requirement that the agency have received federal benefits in excess of $10,000 and could argue that the interpretation of the jurisdictional requirement is unclear on its face or on the facts presented here, it is undisputed that the prosecution did not have to prove the defendants' knowledge of the jurisdictional requirement or its factual predicates. Doc. #478 at 12–13 (jury instructions for jurisdictional requirement); *see also United States v. Escalera*, 957 F.3d 122, 130 (2d Cir. 2020) (noting presumption that defendant need not know facts establishing jurisdictional requirement).

have fair notice that the statute could criminalize their participation in what they believe were otherwise lawful corporate retreats.

Here again I need not engage with the parties' arguments about the Kentucky Derby trip expenses that were incurred in 2015 or about the large-group trip to the Greenbrier in October 2015. That is because, as I have discussed above, a reasonable jury could have convicted the defendants solely on the basis of their small-group trip to the Greenbrier in August 2015. This trip was falsely expensed by Rankin to CMEEC's compensation committee, and there was no evidence that the CMEEC board or its budgeting committee approved this trip as a valid retreat expense.

A reasonable jury could have concluded that this entire trip to the Greenbrier in August 2015 was taken by Rankin, Sullivan, and Bilda for purely personal reasons. The defendants can scarcely complain that they lacked fair notice that they may not knowingly and intentionally use corporate funds for a personal golfing and fine dining vacation at a luxury resort.

The defendants' due process argument is also refuted by the jury's specific *mens rea* findings in accordance with the detailed jury instructions. *See Skilling v. United States*, 561 U.S. 358, 412 (2010) (noting that statute's "*mens rea* requirement further blunts any notice concern"). The jury was told that it could not convict the defendants unless they "knowingly and intentionally misappropriated property valued at $5,000 or more."[148] The jury was further instructed at length that it could not convict any defendant "if the defendant had a good faith belief that the expense served a legitimate corporate purpose of CMEEC" or because of "a good faith mistake about whether the expense would serve a legitimate corporate purpose," and that

---

Therefore, any lack of clarity about the law or evidence to support the jurisdictional requirement furnishes no grounds for the defendants to argue that they lacked fair notice that what they did was a crime.

[148] Doc. #478 at 8.

"[t]he prosecution bears the burden to prove beyond a reasonable doubt that the defendant did not act in good faith and that instead he knowingly and intentionally misappropriated $5,000 or more of property during the relevant calendar years for Count 2 and Count 3."[149]

Thus, although the defendants seek to characterize themselves as having been subject to an unfair and novel prosecution for taking part in lavish-but-legitimate corporate retreats, the jury did not convict them for that. To the contrary, the jury convicted them on the ground that they knowingly and intentionally misappropriated at least $5,000 of corporate money in 2015 without any good faith belief that it was for a proper corporate purpose.

If the language of the criminal statute is clear and especially if the statute requires a finding of specific intent, the Second Circuit has rejected a defendant's fair notice argument notwithstanding that the prosecution was novel and that there was no previously litigated fact pattern that was precisely on point. *See United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995). So too here. Accordingly, to the extent that the defendants argue that they did not have fair notice that what they did was a crime, I will deny their motion for judgment of acquittal.

### B. *Motions for mistrial and new trial*

The defendants Rankin, Sullivan, and Bilda move for a new trial.[150] Rule 33 of the Federal Rules of Criminal Procedure allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). "The

---

[149] *Id.* at 10.
[150] Doc. #552. The defendants also orally moved multiple times for a mistrial near and at the close of evidence. Docs. #457, #459, #465, #467.

trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict." *Ibid.* The "ultimate test" for a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018).

### 1. *Constructive amendment and prejudicial variance*

The defendants move for a new trial on the ground that the government allegedly changed its theory between the indictment and the trial. In the indictment, they argue, the government alleged that *all* the trips were entirely personal. But at trial, they say, the government changed its theory of liability: it argued that the defendants were guilty so long as *some* of the trip costs—such as those extra costs for Sullivan's bartender and for Bilda's parents—were personal and added up to the $5,000 threshold of § 666.[151] According to the defendants, the government's alleged change of theory amounted to a constructive amendment of the indictment or alternatively a prejudicial variance from the terms of the indictment.

"A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted." *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021). "A defendant claiming constructive amendment must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *Ibid.*

In contrast to a constructive amendment, "[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* at 294. "To warrant reversal, the defendant must show that

---

[151] Doc. #552-1 at 20–27.

substantial prejudice occurred at trial as a result of the variance." *Ibid.* "A defendant cannot demonstrate that he has been prejudiced by a variance where the pleading and the proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Ibid.*

The defendants have shown neither a constructive amendment nor a prejudicial variance. Count Three of the indictment specifically alleges that they violated § 666 in 2015 by misappropriating $5,000 or more of property that was owned by or under the care, custody, or control of CMEEC.[152] The government's reliance at trial on the $5,000 threshold was fully consistent with what the indictment expressly alleged and with all that § 666 itself requires for conviction.

To be sure, the indictment can be read to allege that *all* of the hundreds of thousands of dollars of trip expenses were illicit: "[t]hese trips did not relate to CMEEC business, CMEEC Member business, and the furnishing of efficient, low-cost and reliable electric power to the Member Towns and their ratepayers," and "[i]nstead, these trips and the related costs for these trips were intended to personally benefit, compensate, and reward the co-conspirators, their family members, friends, and associates."[153] But that did not mean that the government was duty-bound to prove more than what § 666 actually requires and more than what Count Three specifically alleged—a misappropriation of at least $5,000.

In any event, the government for its part actually tried to prove that all—not just some—of the trip expenses were personal. When it focused on particular expenses such as for Sullivan's

---

[152] Doc. #1-1 at 18 (¶ 65).
[153] *Id.* at 7 (¶ 19).

bartender or Bilda's parents, it did not concede that any other trip expenses were lawful or legitimate.

The defendants point to a statement by the government at a pre-trial hearing that it had "drawn the line that these expenses as alleged were wholly personal" and that "[t]hey were not retreats that the Government would allege were 50 percent legitimate and 50 percent too lavish."[154] But this statement does not conflict with the government's theory and efforts at trial to prove that all—not just some—of the trip expenses were unlawful misappropriations.

The defendants cite a statement to the court by one of the prosecutors during Rule 29 arguments and outside the presence of the jury that "I don't think the jury needs to find that the trips were purely personal. All they need to find is that there was $5,000 that was wrongfully taken in one of the enumerated methods."[155] But they do not point to any argument that the prosecution ever made to the jury that the trips were *not* purely personal.

The defendants also cite a passage from the government's closing argument in which a prosecutor referred to the jury instructions which allowed the jury to "accumulate or combine various expenses" to reach the $5,000 threshold, but they overlook the fact that the prosecutor went on to say: "Ladies and gentlemen, you know the defendants knowingly and intentionally misappropriated more than $5,000 *because the trips were personal*."[156] The government did not change its theory as the defendants claim.

The defendants further argue that the government "broadened" the scope of the indictment when it relied on evidence like Sullivan's bartender and Bilda's parents and to suggest that these and similar non-CMEEC guest expenses alone exceeded the $5,000

---

[154] Doc. #552-1 at 15 (quoting Doc. #140 at 36) (boldface and emphases omitted).
[155] *Id.* at 18 (quoting Tr. 2733).
[156] Tr. 4156 (emphasis added); *see also* Tr. 4157 ("On their face, these trips are personal."); Tr. 4158 ("These are personal trips, ladies and gentlemen.").

threshold.[157] This argument makes no sense because the indictment expressly alleged the $5,000 threshold and that the trips were personal for numerous reasons including that friends and family of the defendants were invited to attend.[158] The government's evidence did nothing to broaden the terms of the indictment.

To the extent that the government chose to focus at times on expenses attributable to the defendants' friends and family, this focus narrowed rather than broadened the scope of the indictment. The law is clear that there is no constructive amendment when the government proceeds on a theory that has been alleged in the indictment but that is narrower than or a subset of the indictment's more ample allegations of wrongdoing. *See United States v. Miller*, 471 U.S. 130, 136 (1985); *United States v. Vilar*, 729 F.3d 62, 81 (2d Cir. 2013).

The defendants fault the government for taking the position in closing argument that when CMEEC guests dropped out of the Kentucky Derby trip in 2015, the defendants should have pursued a refund like Rankin later did when the Kentucky Derby trip was cancelled in 2017.[159] But this was a fair and foreseeable inference for the government to argue in response to the defense claim that last-minute cancellations left little choice in 2015 but to invite non-CMEEC-personnel or to see the prepaid ticket packages go to waste.[160] The government's argument tended to show that the 2015 Kentucky Derby trip was taken for wholly personal reasons and not in good faith for CMEEC's benefit. That is consistent with the theory of the indictment.

---

[157] Doc. #552-1 at 27.

[158] Doc. #1-1 at 7 (¶¶ 17, 19).

[159] Doc. #552-1 at 18–19; *see* Tr. 4422–23.

[160] *See, e.g.*, Tr. 3873. The defendants could not have been surprised by this aspect of the government's closing argument because I raised the very same point with defense counsel when they moved for a judgment of acquittal at the close of the government's case-in-chief. Tr. 2677–78. The contradiction was obvious.

Lastly, even assuming there was a variance between the indictment and the government's proof at trial, the defendants have not shown prejudice as they must to sustain a claim of prejudicial variance. Their defense was that *none* of the trip expenses were misappropriated. This defense was equally applicable regardless whether the government was arguing that *all* of the trip expenses were misappropriations or that only *some* of the trip expenses (at least $5,000) were misappropriations. The defendants have not explained how their strategy or defense at trial was compromised by the government's alleged change of theory between indictment and trial.

The government's evidence and arguments at trial were fully consistent with the core of criminality alleged in the indictment. Accordingly, to the extent that the defendants claim a constructive amendment or prejudicial variance, I will deny their motion for new trial.

### 2. *Prejudicial spillover evidence*

The defendants next move for a new trial on the ground that they suffered "prejudicial spillover" from the introduction of evidence in support of a count that was dismissed and a theory that was rejected by the jury in a special interrogatory.[161] The upshot, according to the defendants, is that the jury was improperly allowed to consider evidence of the defendants' allegedly improper acts in 2016 and 2017 and that this caused spillover prejudice to the jury's verdict concluding that the defendants misappropriated CMEEC's property in 2015.

First, the defendants complain of evidence that was introduced as to Count Four. This count concerned alleged misappropriations in 2016 and, as noted above, it was dismissed on motion of the government near the end of trial. According to the defendants, they were prejudiced by the jury's consideration of the evidence that the government had already introduced to support Count Four before it was dismissed.

---

[161] Doc. #552-1 at 27–49.

Second, the defendants arguably raise a prejudicial spillover complaint about evidence that was introduced to support the government's so-called "member-town" theory—its theory that the property that was misappropriated by the defendants was owned by the member towns rather than by CMEEC.[162] As noted above, § 666 requires in part that the property that has been misappropriated either be "owned by" or "under the care, custody, or control" of the "organization, government, or agency" for whom the defendant acts as an agent and that receives in excess of $10,000 in federal benefits. *See* 18 U.S.C. § 666(a)(1)(A), § 666(b).

The government's theory at trial was that the member towns owned the funds used to finance the trips to the Kentucky Derby and the Greenbrier and that these funds in turn were under the care, custody, or control of CMEEC when the funds were expended for the trips.[163] By contrast, the defendants denied that the member towns owned any of the property used for trip expenses; they argued instead that CMEEC both owned and had care, custody, or control of the funds used to finance the trips.[164]

By special interrogatory the jury rejected the government's member-town theory. It concluded that the property misappropriated by the defendants in 2015 was owned by CMEEC and not by the member towns. Nevertheless, according to the defendants, the member-town theory prejudiced them because it served as a vehicle for the government to introduce evidence of their allegedly wrongful acts that occurred in 2016 and 2017.[165]

---

[162] I say "arguably" because it is not so clear from the defendant's motion for new trial whether their prejudicial spillover argument extends not only to Count 4 but also to Count 1 which was dependent in part on the member-town theory. I will address the member-town theory in more detail in the next section of this ruling.

[163] Tr. 4013, 4173; Doc. #554 at 39.

[164] Tr. 2685–87, 2695–97, 4016.

[165] In particular, the defendants point to the fact that, even after the government dismissed Count Four, the government continued to pursue Count One which charged a conspiracy to violate § 666 from 2014 to 2017. Tr. 3306–07 (prosecutor explaining that the Count One conspiracy charge remained valid despite dismissal of Count Four "because the allegations in Count One are a little broader than Count 4"); Doc. #554 at 38 (government argument that the member-town theory "remained part of the case by virtue of the conspiracy charged in Count 1"). But because there was no evidence that CMEEC itself had received $10,000 of federal benefits after 2015, any

As an initial matter, Sullivan is in a far weaker position than Rankin and Bilda to make a prejudicial spillover argument. It was undisputed that Sullivan had left CMEEC in September 2015–and the jury was reminded of this in the jury instructions.[166] Although the government initially charged Sullivan in Count Four, it dismissed this charge against him prior to trial.[167] Because there was scant evidence introduced about anything that Sullivan did in 2016 or 2017, it is hard to see how he can argue that any evidence from 2016 or 2017 affected the jury's verdict against him for misappropriating CMEEC funds in 2015.

"The concept of prejudicial spillover … requires an assessment of the likelihood that the jury, in considering one particular count or defendant, was affected by evidence that was relevant only to a different count or defendant." *United States v. Hamilton*, 334 F.3d 170, 182 (2d Cir. 2003). This means that there can be no claim of prejudicial spillover when a defendant complains about evidence that was admitted in support of an invalidated count or theory but that would also have been admissible as to the charge for which he has been convicted. Put differently, "prejudicial spillover can occur only if the evidence introduced to support the reversed count would have been inadmissible at a trial on the remaining count." *United States v. Cross*, 308 F.3d 308, 317 (3d Cir. 2002).

The primary problem for the defendants' prejudicial spillover claim is that the large majority of the evidence about which they complain was properly admissible in the first instance

---

misappropriations that occurred after 2015 would not have been unlawful under § 666 unless there were alternative grounds to show that the defendants were agents of one or more *member towns*, that they misappropriated $5,000 or more of property owned by or under the care, custody, or control of the *member towns*, and that one or more of the *member towns* received $10,000 in federal benefits in each of those calendar years. Using the member-town theory, the government argued that the defendants continued to violate § 666 by means of misappropriation of member towns' property in 2016 and that—notwithstanding the absence of any trip expenses that occurred in 2017—the conspiracy continued into 2017 by means of the defendants' alleged efforts to conceal their prior wrongdoing. Doc. #554 at 39.

[166] Doc. #478 at 19.

[167] Doc. #114 at 13 n.3; *see* Doc. #166 at 37.

as to Count Three. Start with the Kentucky Derby trip in 2016. Most of the expenses for this trip were incurred by prepayment in 2015. These expenses were properly attributed to Count Three for alleged misappropriations that occurred in the year 2015. Therefore, the jury properly learned that CMEEC spent hundreds of thousands of dollars in 2015 to buy ticket packages for the 2016 Kentucky Derby.

Moreover, it was the jury's job to decide if these prepayments in 2015 for the Kentucky Derby in 2016 were accompanied by an unlawful criminal intent. Although the jury surely considered evidence of what the defendants said and did in 2015, they also could have appropriately considered evidence of what the defendants said and did in 2016 and 2017 to the extent that this evidence might shed light on what they had previously intended in 2015. "Courts may properly admit evidence of acts [a] defendant took subsequent to the crimes for which he is on trial in order to prove [a] defendant's intent." *United States v. Presley*, 24 F. App'x 12, 14 (2d Cir. 2001). "Subsequent acts are frequently probative as to intent." *United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013).

Even assuming that the government had never charged Count Four and never advanced its member-town theory, I would have allowed the government to introduce witnesses and evidence about who joined the Kentucky Derby trip in 2016. For example, CMEEC purchased in 2015 even more ticket packages for the 2016 Kentucky Derby trip than it had for the 2015 Kentucky Derby trip, and it did so notwithstanding that a large number of participants in the 2015 Kentucky Derby trip had no business affiliation to CMEEC. I would have allowed the government to show how a large number of the 2016 Kentucky Derby participants did not actually have a business affiliation with CMEEC, consistent with the government's theory that

the defendants knew and intended in 2015 that the prepaid expenses for the 2016 Kentucky Derby were not to be for a legitimate corporate purpose.[168]

Similarly, I would have allowed testimony and other evidence about the extravagant transport, hotel, meal, and Trophy Room tickets for the 2016 Kentucky Derby. All this would have tended to show that the defendants knew and intended at the time that the majority of the trip expenses incurred in 2015 would not be for a legitimate corporate purpose.

I also would have allowed evidence about the defendants' responses to adverse publicity when the trips became public in 2016 and about the pre-payment for and cancellation of the 2017 Kentucky Derby trip. This evidence was properly relevant to the government's consciousness-of-guilt arguments stemming from the cancellation of the 2017 Kentucky Derby trip and from the statements made to allegedly conceal details of past trips.

In addition, I would have allowed evidence of the refund of the 2017 trip and Rankin's re-purchase of some of the Kentucky Derby trip packages for his personal use. As discussed above, the fact that Rankin successfully obtained a partial refund of the 2017 trip packages tended to undermine the defense theory that the inclusion of non-CMEEC-personnel as guests for the Kentucky Derby trips—including the 2015 trip—was appropriate because otherwise the ticket packages would have gone to waste. And the fact that Rankin himself bought some of the refunded Kentucky Derby tickets for his own personal use tended to show—just as the government claimed—that his real reason for going to the Kentucky Derby was for a personal vacation rather than for any legitimate CMEEC business purpose.

---

[168] *See* Doc. #554 at 37–38 (describing some of the guests on the 2016 Kentucky Derby trip who had no business affiliation with CMEEC including the wife and mother-in-law of a board member who did not attend, a CMEEC vendor's daughter and son-in-law who had no prior connection to CMEEC, and the retired former mayor of Groton—along with his wife—who was a golfing friend of DeMuzzio).

So far as I can tell, just about the only evidence that was introduced in support of Count Four or in support of the government's member-town theory that would *not* have been admissible in support of Count Three was the evidence of federal benefit funding for two of the member towns. The government introduced evidence of federal housing benefits paid to the City of Norwich from 2014 to 2016 and of federal snow removal benefits paid to the City of Groton in 2016.[169] This funding evidence was ho-hum dull and dry. I cannot imagine that it had the least bit of effect on the jury's decision to return a verdict of guilty against any of the defendants for Count Three for the year 2015. The defendants do no more than baldly speculate that the jury drew an inference between the money that the defendants themselves misappropriated from CMEEC and the federal benefits that were separately received by Norwich and Groton.[170]

To be sure, at oral argument on the defendants' post-trial motions, I stated my concern that the government's member-town theory "allowed the introduction of really a large amount of evidence that would not otherwise have come in or would have been at least subject to 404(b) screening and cautionary instructions."[171] I have reconsidered that view. I am convinced for the reasons explained above that there is very little evidence from 2016 and 2017 that I would not have allowed in support of Count Three.

Moreover, to the extent that activities in 2016 and 2017 may have qualified as "other acts" evidence subject to Rule 404(b) of the Federal Rules of Evidence and that a limiting instruction should have issued, it would have been to confine the jury's consideration of any such evidence from 2016 to 2017 to its evaluation of Count Three. But this is what the jury self-evidently did when it returned a guilty verdict only as to Count Three. Although a limiting

---

[169] Doc. #582 at 29–31; Doc. #478 at 16; Tr. 1981–2029 (HUD funding to City of Norwich); Tr. 2400–2407 (HUD funding to City of Norwich); Tr. 2492–2510 (FEMA funding to City of Groton for snow removal).
[170] Doc. #552-1 at 36–37.
[171] Doc. #566 at 76.

instruction would have warned the jury that they could not consider the evidence for an improper propensity purpose, it is apparent from the fact that the jury acquitted the defendants of most of the charges that the guilty verdict for Count Three was not the product of improper propensity inferences.

In any event, even if I were to accept the defendants' assumption that the bulk of evidence that the government admitted about events in 2016 and 2017 would not have been admissible in support of Court Three, the defendants would still not be entitled to relief under the prejudicial spillover doctrine. "A defendant raising a claim of prejudicial spillover bears an extremely heavy burden." *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988). A court must evaluate the following three factors: "(1) whether the evidence introduced in support of the vacated count was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts, (2) whether the dismissed count and the remaining counts were similar, and (3) whether the government's evidence on the remaining counts was weak or strong." *Hamilton*, 334 F.3d at 182; *see also United States v. Swinton*, 797 F. App'x 589, 599 (2d Cir. 2019) (same). I will address each factor in turn.

As to the first factor, the evidence of the defendants' acts in 2016 and 2017 was not of such an inflammatory nature that it would have tended to incite or arouse the jury into improperly convicting the defendants for misappropriations in 2015. For the most part, the evidence of the Kentucky Derby trip that occurred in 2016 and the one that was planned for 2017 was highly similar to the evidence of the 2015 trip to the Kentucky Derby. It was just more of the same: high-priced premium Derby tickets, a charter jet, extravagant expenses, and the inclusion of people with no business relationship with CMEEC. There was nothing more sensational about the evidence of trips for 2016 and 2017 than the evidence already properly before the jury about

the multiple trips in 2015 and the pre-payment in 2015 for another Kentucky Derby trip in 2016. The unsurprising fact that the federal government furnished housing assistance to Norwich and snow removal assistance to Groton was hardly inflammatory or prejudicial to any of the defendants.

As to the second factor, the dismissed count (Count Four) was highly similar to the count of conviction (Count Three). The member-town theory that was advanced by the government to justify the duration of the conspiracy into 2016 merely paralleled the main theory of Count Three that the funds misappropriated in 2015 were under the care, custody, or control of CMEEC. All the counts and theories involved very similar allegations of the misappropriation of property used for expensive trips outside of Connecticut that appeared to have little to do with advancing CMEEC's business to furnish low-cost electricity for member towns in Connecticut.

As to the third factor, the government's evidence to support the defendants' conviction on Count Three was very strong. In particular, as discussed above, the government's evidence against each of the three defendants with respect to their small group golfing trip to the Greenbrier in August 2015 was particularly damaging and highly indicative that the defendants expended CMEEC funds for the entirety of that trip for what they knew was no legitimate corporate purpose.

On top of all this is one more consideration: the fact that the jury acquitted the defendants of Count One and Count Two and that it also explicitly rejected the government's member-town theory. What this suggests is that the jury itself discounted the very evidence about which the defendants now complain.

As the Second Circuit has made clear, "[t]he absence of [prejudicial] spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others."

*Hamilton*, 334 F.3d at 183. "[W]here the record indicates that the jury was able to distinguish between counts or between defendants, and to assess separately the evidence pertinent to each, we have found no basis for concluding that a new trial was warranted because of prejudicial spillover." *Ibid*. "Partial acquittal of a defendant strongly indicates that there was no prejudicial spillover." *United States v. Morales*, 185 F.3d 74, 83 (2d Cir. 1999).

Lastly, the defendants more generally complain about government questions and argument that pointed to the fact that the misappropriation of trip expenses would have adversely affected the member towns, such as by impacting the monies from CMEEC's operations that flowed to the member towns.[172] But this complaint is not really about the member-town theory, which theory is premised on the notion that the member towns *owned* the misappropriated property, rather than whether the member towns were *adversely affected* by the misappropriations.

In any event, I dealt with this separate issue by means of a pre-trial ruling allowing the government subject to foundation to introduce evidence about the flow of funds and the impact on ratepayers and taxpayers. *See United States v. Rankin*, 2021 WL 5049354, at *6 (D. Conn. 2021). The defendants have not shown that the government violated my pre-trial ruling or that its questions and arguments about the effect of misappropriations on member towns are grounds for a new trial.

### 3. *Admission of member-town evidence*

Apart from any prejudicial spillover challenge to the member-town theory, the defendants separately argue that evidence in support of the member-town theory was erroneously admitted in the first place.[173] As noted above, the member-town theory is the theory that it was the

---

[172] Doc. #583 at 19.
[173] Doc. #552 at 35–40.

member towns—not CMEEC—that owned the property that was misappropriated by the defendants. The defendants objected to the member-town theory on the ground that the funds used for trip expenses all came from a CMEEC bank account and were owned by CMEEC at the time that they were used to pay for trip expenses.

The defendants' argument for error might be interpreted in three ways. The first is a claim that I erred from the outset of the trial when I allowed the government to proceed at all with its member-town theory even after the defendants had raised a pre-trial challenge to the member-town theory. The second is a claim that I erred (again) when I did not strike the government's member-town evidence at the conclusion of the government's case-in-chief or at the conclusion of all the evidence, but instead allowed the government to argue its member-town theory to the jury. And the third is a claim that—apart from whether I erred with respect to allowing or not striking the evidence—a new trial or even dismissal is nonetheless warranted because the government engaged in misconduct by pressing a theory of culpability that was frivolous. I will address each of these three arguments in turn.

The first argument is that it was error to allow the government to introduce any evidence at all in support of the member-town theory. I do not agree. True enough, when I addressed the defendants' numerous pre-trial challenges to the indictment, I voiced "substantial doubts about whether any of the funds alleged to have been misappropriated were, at the time of their misappropriation, owned by or under the care, custody, or control of any of the CMEEC member towns." *United States v. Rankin*, 422 F. Supp. 3d 564, 585 (D. Conn. 2019). But as I explained when I denied the defendants' motion to dismiss the indictment, a judge does not have authority to pre-screen the government's evidence prior to the start of trial and to preclude evidence that the judge believes will not suffice to carry the government's burden to prove guilt beyond a

48

reasonable doubt. *See id.* at 578. I declined to engage in "a prohibited factual inquest that the defendants' position is correct or compelled as a matter of law." *Id.* at 585.[174]

Although the defendants try to frame the member-town theory as an issue of pure law rather than one that requires consideration of the evidence, that is not so. Whether the member towns owned the money that was misappropriated is a mixed question of fact and law. It depends on a fact-specific evaluation of the evidence—such as CMEEC's Membership Agreement as well as CMEEC's financial and accounting records. The government rightly argued that I could not resolve the validity of the member-town theory as a matter of law prior to trial.

The second argument is that I should have stricken the government's member-town evidence at the close of the government's case-in-chief or at the close of all the evidence at which time it was allegedly apparent that the government had not proved its member-town theory beyond a reasonable doubt. Instead, I chose to allow the jury to decide whether the government had proved its member-town theory beyond a reasonable doubt.

I ended up instructing the jury in a manner consistent with and favorable to the defendants' arguments that the money used for the trips was owned by CMEEC. I told the jury that "CMEEC as a corporation has lawful authority to own property" and that "[i]t is a basic rule of corporate law that a corporation like CMEEC is legally distinct from those who own the corporation (*i.e.*, its shareholders or those who own an equity interest in the corporation)," which "means that if a corporation owns property—such as money in a bank account—then the property is not owned by the corporation's owners unless there is an agreement that the property

---

[174] The same reasons justified denial of the defendants' pre-trial motion *in limine* to preclude the government from introducing evidence in support of the member-town theory. Doc. #384 at 4–5.

is jointly owned by both the corporation and its owners or that the property is held in trust by the corporation on behalf of its owners."[175]

By special interrogatory the jury rejected the government's member-town theory. It concluded that the government had not proved beyond a reasonable doubt that Norwich or Groton either "owned or had care, custody, or control of the property that was knowingly and intentionally misappropriated."[176]

A trial judge has discretion to reserve decision on a motion for judgment of acquittal until after the jury has returned a verdict. *See* Fed. R. Crim. P. 29(b); *United States v. Reyes*, 302 F.3d 48, 50 (2d Cir. 2002). Similarly, a judge has discretion whether to grant a motion to strike evidence from the record. *See 360Heros, Inc. v. Mainstreet Am. Assurance Co.*, 816 F. App'x 555, 557 (2d Cir. 2020). Because the member-town evidence was already before the jury, I remain convinced that the better course was to allow the jury to resolve this fact-based issue of whether the government's evidence was enough to show that the member towns owned the property that was misappropriated. That is what the jury did—and it resolved the issue against the government and in the defendants' favor.

But if I was wrong either to allow the evidence in the first place or not to strike it during trial, then I do not see how the error resulted in any prejudice to the defendants. The harmless-error rule of the Federal Rules of Criminal Procedure instructs that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). The jury rejected the government's member-town theory, and it acquitted the defendants of the only remaining count—the conspiracy charged in Count One—that relied on

---

[175] Doc. #478 at 11.
[176] Doc. #485 at 4.

the member-town theory.[177] As discussed in the previous section above, the large majority of evidence that the defendants challenge with respect to activities in 2016 and 2017 would have been independently admissible to prove Count Three. To the extent that there was evidence of federal housing and snow removal grants for Norwich and Groton, it is very hard to see how such evidence could conceivably have affected the jury verdict for Count Three. So if I was wrong not to strike the government's member-town evidence during trial, the error was harmless and does not justify the grant of a new trial.

This brings me to the defendant's third argument: their claim that a new trial or dismissal of the indictment is warranted because the government's member-town theory was not just wrong but was outright frivolous. I assume for purposes of this ruling that it is misconduct for the government to proceed at a criminal trial on the basis of a theory or claim that is frivolous. True enough, the Federal Rules of Criminal Procedure do not have an equivalent to Rule 11 of the Federal Rules of Civil Procedure which authorizes a court to impose sanctions on a party who advances a claim that is frivolous or in bad faith. *See* Fed. R. Civ. P. 11. Nevertheless, it would be hard to square with basic due process notions of fairness if the prosecution in a criminal case were free to secure the admission of otherwise inadmissible evidence merely by pressing a frivolous claim or theory at trial. For its part, the government does not dispute that it would be misconduct if its member-town theory were frivolous.

A claim or theory is not frivolous unless it is manifestly meritless and obviously lacking a basis in law or fact. *See United States v. Bove*, 888 F.3d 606, 608 (2d Cir. 2018); *see also Neitzke*

---

[177] The jury was instructed for the conspiracy charged in Count One that it could rely either on evidence showing that CMEEC owned or had care, custody, or control of the property or on evidence that Norwich and/or Groton owned the property that was misappropriated. Doc. #478 at 16. By contrast, the jury was instructed for Count Three that it could consider *only* whether CMEEC owned or had care, custody, or control of the property that was misappropriated. *Id.* at 11.

*v. Williams*, 490 U.S. 319, 325 (1989) (noting that "a complaint, containing as it does both factual allegations and legal conclusions, is frivolous where it lacks an arguable basis either in law or in fact"). The fact that a claim or theory is weak and that it is rejected by a judge or jury does not mean that it was frivolous. If the validity of a claim or theory is subject to a reasonable or rational debate, it is not frivolous.

The law and our adversarial system of justice allows for robust debate about the meaning of evolving legal standards and the interpretation that should be given to the facts. For this reason, the cases where a losing argument can be classified as frivolous should be very rare. Whenever a court is asked to condemn a losing claim or theory as no less than frivolous, it must be aware of the danger of chilling fair and vigorous advocacy. It must also be alert to the possibility of mistaking its strongly held views about the lack of merit of the losing party's argument with a conclusion that the claim or theory was not subject to reasonable debate in the first place. For this reason, a court should very carefully examine an argument that one party's claim or position was frivolous by stepping back to consider whether there is any conceivably debatable argument to be made in support of the losing party's position even if it happens that the losing party may not have researched or articulated that argument as thoroughly or clearly as the court might have liked.

According to the government, the member-town theory was justified because "any dollar 'owned' by CMEEC essentially is owned by each Member Town in proportion to its ownership percentage in CMEEC."[178] To this day, the government broadly insists that "because CMEEC is

---

[178] Doc. #114 at 35. At one point, the government suggested a theory of dual ownership. *See* Doc. 352 at 25 (government briefing stating that the defendants "ignore[] how cooperatives function" and that "alleging that the funds used for the Kentucky Derby and Greenbrier trips were 'owned by and under the care, custody and control of CMEEC' necessarily means that the funds were also 'owned by and under the care, custody and control' of the CMEEC Members").

a cooperative, CMEEC money is member money."[179]

As the trial transcript reflects, I was puzzled no less than the defendants were by this broad and sweeping theory that CMEEC itself does not own *any* of its money or assets. The government's "CMEEC money is member money" theory conflicts with the terms of the CMEEC authorization statute that creates CMEEC as a corporation (a "public body corporate") and that empowers CMEEC like any private corporation to hold funds in its own name. *See* Conn. Gen. Stat. § 7-233e(b)(9) (authorizing CMEEC "[t]o acquire, hold, use and dispose of its income, revenues, funds and moneys"); § 7-333e(b)(29) (authorizing CMEEC "generally to exercise in connection with its property and affairs, and in connection with property within its control, any and all powers that might be exercised by a natural person or a private corporation in connection with similar property and affairs").

I also could not see how the government's theory squares with the very basic rule of corporate law that a company is a legal entity that is distinct from its shareholders, such that a company's property and assets are *not* owned by its shareholders. *See, e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75 (2003) (noting that "[a] basic tenet of American corporate law is that the corporation and its shareholders are distinct entities" and that "[a]n individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets"); *United States v. Wallach*, 935 F.2d 445, 462 (2d Cir. 1991) ("shareholders do not hold legal title to any of the corporation's assets" but "the corporation—the entity itself—is vested with the title"); *In re Beck Indus., Inc.*, 479 F.2d 410, 415 (2d Cir. 1973) ("Ownership of all of the outstanding stock of a corporation, however, is not the equivalent of ownership of the [corporation's] property or assets."); *State v. Papandrea*, 302 Conn. 340, 346–47 (2011) ("It is an elementary

---

[179] Doc. #554 at 36.

principle of corporate law that a corporation and its stockholders are separate entities and that the title to the corporate property is vested in the corporation and not in the owner of the corporate stock." (quoting *State v. Radzvilowicz*, 47 Conn. App. 1, 19 (1997)).

For this reason, although I denied the defendants' pre-trial challenge to the government's member-town theory, I nonetheless noted that I had doubts from the pre-trial submissions whether the government would have enough evidence to substantiate its member-town theory. As noted above, I wrote that "[the] defendants have raised substantial doubts about whether any of the funds alleged to have been misappropriated were, at the time of their misappropriation, owned by or under the care, custody, or control of any of the CMEEC member towns."[180] And I presumed that the government would come forward with evidence or a theory at trial that would at least arguably be enough to sustain its member-town ownership theory beyond a reasonable doubt.

Still, when the time came for mid-trial arguments of the defendants' Rule 29 motions for judgment of acquittal, the government could not cite precedent to support its claim that CMEEC's members had an ownership interest in all the funds maintained by the company in the company's name. When I asked if there was "any case law on this that says that the shareholders of a company own all of the assets that a company has," the government responded that it was "not aware of any" but that it was "happy to look into that."[181] I suggested that the time for the government to "look into that" was many months or years ago when it decided to charge and pursue the member-town theory in the first place.[182]

---

[180] Doc. #166 at 21.
[181] Tr. 2738.
[182] *Ibid.*

Following oral argument on post-trial motions, I entered an order for supplemental briefing. I asked the parties to address whether the government's member-town theory was frivolous and, if so, whether this should militate in favor of a dismissal of the indictment or a new trial.[183]

The government's supplemental briefing argues that cooperatives are different from corporations. It cites a corporate law treatise that has a section devoted to the subject of "cooperative corporations" and that states in part that "[c]ooperative corporations operate on different principles than general business corporations." *See* FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 68.10.[184] But there is nothing in this provision stating that one of the "different principles" is that a cooperative's members own *all* the assets of a cooperative unlike the usual rule that applies to general business corporations.

Instead, the treatise emphasizes that "[b]ecause of the distinctive features of cooperatives, each state has separate statutes governing the incorporation and operation of cooperatives." *Ibid.* Yes, that is so. And that underscores the necessity to look to CMEEC's authorizing statute that— as discussed above—makes clear that CMEEC is entitled like any other corporation to own money, property, and assets. Rather than reckoning with these provisions, the government launches into a bridge-to-nowhere recitation of provisions of the authorizing statute governing the regulation of CMEEC's rates, competitive bidding requirements, FOIA regulation, vesting of

---

[183] Doc. #564 (supplemental briefing order).

[184] The government quotes only a portion of the sentence that appears in the treatise. Doc. #582 at 7. The full provision that appears in the treatise states: "Cooperative corporations operate on different principles than general business corporations, *with different methods of profit sharing, if any.*" FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 68.10 (emphasis added). Thus, the one example cited by the treatise of how cooperatives "operate on different principles than general business corporations" has to do with "profit sharing" and nothing to do with any principle relating to who owns the cooperative corporation's assets.

property upon dissolution, and tax-exempt status among multiple provisions that have nothing to do with the issue of whether CMEEC owns property.[185]

Nor does the government acknowledge statements from the treatise that are contrary to its position. For example, the treatise affirms the baseline rule that "[t]he property of the corporation is its property and not that of the shareholders as owners." *Id.* § 31. It further states that "[t]he distinctness of the corporate entity applies equally to *all kinds of corporations*" and specifically that "*[c]ooperative corporations … are just as distinct entities as are other corporations*." *Id.* § 25 (emphasis added).

Next, the government relies on a federal government publication—*Co-ops 101: An Introduction to Cooperatives*—issued by the U.S. Department of Agriculture. It cites a quote from the publication stating that "[t]he people who use a cooperative own it" and "own the assets."[186] But as with its reliance on the corporate law treatise, the government fails to acknowledge language from the same publication that undermines its theory: that "[c]ooperatives are *a type of corporation*," that "[a] corporation has the right to provide services, *own property*, borrow money, enter into contracts and is liable for its own debts," and that "[a] cooperative corporation is also a state-chartered business[] organized and operating *under its laws*."[187] So even this publication ends up supporting the defendants' arguments that the CMEEC authorization statute controls and that a corporation—"cooperative" or not—may own its own property.

The government otherwise cites stray dicta such as from a federal district court in Tennessee which states without citation to any legal authority that a cooperative's members

---

[185] Doc. #582 at 8–10.
[186] *Id.* at 7 (quoting *Co-ops 101: An Introduction to Cooperatives* at 16, U.S. DEP'T OF AGRIC. (2012), https://www.rd.usda.gov/files/cir55.pdf [https://perma.cc/AJ3K-BLF7]).
[187] *Co-Ops 101*, *supra* note 186, at 37, 39, 42 (emphases added).

"ultimately jointly own all of [the cooperative's] assets." *In re Se. Milk Antitrust Litig.*, 2011 WL 3205798, at *6 (E.D. Tenn. 2011). But plenty of cases say the same about shareholders and corporations: that shareholders "equitabl[y]" or "ultimately" own the assets of a corporation. *See, e.g.*, *United States v. Shotts*, 145 F.3d 1289, 1298 (11th Cir. 1998); *In re Ivan F. Boesky Sec. Litig.*, 825 F. Supp. 623, 636 (S.D.N.Y. 1993), *aff'd*, 36 F.3d 255 (2d Cir. 1994). This generality does not dispense with basic corporate law principles that a company is nonetheless legally distinct from its owners and that the company's owners do not own all of the company's money and assets as the government claims.

The government also cites various statements by witnesses—often in response to leading questions—agreeing or opining to the effect that "CMEEC money is member money." But none of these witnesses were identified by the government as experts on the law of company ownership. *See* Fed. R. Evid. 702; *Antrim Pharms. LLC v. Bio-Pharm, Inc.*, 950 F.3d 423, 431 (7th Cir. 2020) (allowing expert opinion on ownership); *United States v. Fennell*, 381 F. Supp. 2d 1312, 1315–16 (D.N.M. 2005) (same). Nor is a complex mixed question of law-and-fact concerning company ownership within the realm of permissible lay opinion testimony. *See* Fed. R. Evid. 701; *United States v. Carlock*, 806 F.2d 535, 551–52 (5th Cir. 1986) (improper lay opinion testimony about defendant's "ownership of heavy equipment and his interest in various businesses").

The fact that the government managed to induce witnesses to opine that they thought that CMEEC's money was the member's money did not itself furnish a non-frivolous basis for the government's member-town theory. If a witness told the government she owned the Brooklyn Bridge, I trust the government would not initiate a prosecution on the basis of this claim without

conducting factual and legal research to make sure that the claim was factually supported and consistent with non-frivolous principles of property law.

If the issue before me were whether the member towns own *all* of CMEEC's money as the government insists, I might well conclude that its position is frivolous. This case looks a lot like *United States v. Banyan*, 933 F.3d 548 (6th Cir. 2019), where the government decided to prosecute two defendants who had defrauded a mortgage company that was in turn owned by a federally insured bank. The problem, however, was that the federal bank fraud statute required the victim to be federally insured, and the victim mortgage company was not federally insured. No worries, said the government, because the bank as owner of the mortgage company was also the "owner" of the mortgage company's money. No way, said the Sixth Circuit in reliance on the same obvious principles of corporate law that I have recited here. *Id.* at 552–54. Indeed, according to the Sixth Circuit, the government's contrary argument was "nearly frivolous." *Id.* at 552.

All that said, the real issue here is more narrow and factbound than the government's blunderbuss claim that *all* of CMEEC's money is its members' money. The real issue is whether it was frivolous for the government to claim that member towns owned the *particular* monies used to fund the trip expenses that the government claims were misappropriated in violation of § 666.

That is a trickier question. And it can only be answered by reference to what the parties to the CMEEC Membership Agreement understood or agreed to in terms of *who* owned the money that was used to finance the trips. Consider what the Membership Agreement says. It broadly requires CMEEC to remit its "margin" or profits to its members. It defines "CMEEC Margin" in relevant part to mean "all revenues less incurred expenses received by CMEEC for services

provided or sold."[188] It then provides in relevant part that "[a]ll CMEEC Margin received in a given month shall be allocated and/or disbursed on the first day of the next calendar month," and that for members like Norwich and Groton "[e]ach Margin Eligible Member as of the date of any allocation and/or disbursement of CMEEC Margin shall receive disbursement of the then-unallocated CMEEC Margin pursuant to such Margin-Eligible Member's Membership Interest Level."[189]

A separate section of the Membership Agreement provides for each member to have a rate stabilization fund.[190] The purpose of the rate stabilization fund was to cushion members from month-to-month volatility in electricity prices.[191] The Membership Agreement states that "CMEEC shall maintain a Rate Stabilization Fund for each Member into which each Member may deposit and maintain funds" and that "[i]n addition to any funds that a Member may elect to contribute to its Rate Stabilization Fund, all CMEEC Margin allocable to any Margin-Eligible Member shall be deposited into the Member's Rate Stabilization Fund unless otherwise directed by the Member."[192] The Membership Agreement further provides that "CMEEC shall manage or cause to be managed all amounts held within the Rate Stabilization Funds … in the same manner that it manages its own funds."[193]

One might think from reading the Membership Agreement—with its references to the margin being "allocated and/or disbursed" and being "deposited" into rate stabilization funds—that CMEEC must have kept separate bank accounts for the margin and the rate stabilization fund. But as the trial testimony made clear, these monies were all maintained in a *single*

---

[188] Gx2 at 5.
[189] Gx2 at 15 (§§ 6.1, 6.2).
[190] *Id.* at 17–18 (§ 9.2).
[191] Dx72 at 176–77; Tr. 116–17, 185, 1045–46; *see also* Gx118 (margin calculations for 2015).
[192] Gx2 at 17–18 (§§ 9.1, 9.2).
[193] *Id.* at 17 (§ 9.1). Of course, the fact that the Membership Agreement references CMEEC's "own funds" is yet one more contradiction of the government's theory that "CMEEC money is member money."

operating bank account that CMEEC maintained in its name at the Bank of America. Rather than divvying these monies into separate bank accounts, CMEEC simply tracked the monies by means of accounting entries and classifications in its books and records.

By early 2015, CMEEC's accounting staff created at Rankin and Pryor's behest a new accounting entry that was called the "contra margin" account and was to be used specifically for the funding of so-called "strategic retreats."[194] This contra margin account would be used instead of the administrative-and-general (A&G) account for the Kentucky Derby trip expenditures from 2015 and 2016 and for the Greenbrier trip in October 2015.[195]

If the trip expenses had been paid from the rate stabilization fund, the government would have had an easier time showing that the monies spent were owned by the members. There is little doubt from the plain language of the Membership Agreement and the trial evidence that the monies allocated to the rate stabilization fund were indeed the property of and owned by CMEEC's members even though kept in the care and custody of CMEEC.[196]

But of course the government's theory as alleged in the indictment and pursued at trial was that the trip expenses were paid against CMEEC's margin through the contra margin accounting mechanism rather than from the rate stabilization fund. So was there a non-frivolous

---

[194] Gx108 at 3, Gx113, Gx114; Tr. 1058–60.

[195] By contrast, it is undisputed that the small-group trip by Rankin, Sullivan, Bilda, and DeMuzzio to the Greenbrier in August 2015 was billed for internal bookkeeping purposes against the A&G account rather than against margin. But the source of funding for this particular trip makes no difference to the defendants' challenge to the member-town theory. That is because the defendants' conviction on Count Three for the year 2015 was not premised on the member-town theory; the jury was instructed for Count Three solely to consider whether CMEEC—rather than any of its members—either owned or had care, custody, or control of the monies that were misappropriated. Doc. #478 at 11. The harm alleged by the defendants from the member-town theory has to do with the introduction of evidence from 2016 and 2017, not from 2015, and there is no dispute that all relevant trip expenses incurred in 2016 were taken against the contra margin account.

[196] Tr. 1686 (undisputed testimony of outside auditor that rate stabilization funds were treated as a liability rather than asset for CMEEC on its balance sheet); *see also* Gx85 at 8; Gx86 at 13.

argument that margin-eligible member towns like Norwich and Groton owned these particular monies *before* they were actually allocated to the rate stabilization fund?

The answer is yes for a combination of reasons. The first is that § 666 is a federal law, and the terms "owned" and "property" are not defined in this law. Nor has the Supreme Court or the Second Circuit issued a decision that authoritatively defines for purposes of § 666 what it means for a person or entity to own property that has been subject to misappropriation. It is unsettled as well whether the terms "owned" and "property" should be defined by reference to federal common law, general principles of state law, or the law of any particular state such as Connecticut.

The Membership Agreement itself makes clear that margin must be set aside for the members' benefit but does not state whether CMEEC's margin-eligible members have any ownership or property interest in monies that have been classified or designated as margin. There is no decisional law on the issue. And the fact that it is hornbook law that CMEEC is a legal entity that is distinct from its members and that CMEEC has legal authority to own money and assets distinct from its members does not answer the more specific question whether a particular class of property—CMEEC's margin—is owned by CMEEC rather than its margin-eligible members. All in all, the lack of a fixed and firm definitional standard of the terms "owned" and "property" and the lack of controlling factually apposite case law makes it difficult to insist that it is altogether frivolous—not just wrong—to claim that CMEEC's members rather than CMEEC itself "owned" and had a "property" interest in the margin money that was used to pay the trip expenses.

The second reason to suggest that there is a non-frivolous argument to show that CMEEC margin was owned by the member towns has to do with the highly context-specific evaluation of

what it means to own or have a property interest. As the Second Circuit has observed, "'property' is a term with a famously diffuse set of meanings across a range of areas of law," and "at least since the end of the nineteenth century, the conceptualistic approach to understanding its meaning has given way to a functionalist approach that designates something as 'property' according to the context and purpose of the designation." *Devlin v. United States*, 352 F.3d 525, 537 (2d Cir. 2003); *see generally* STUART BANNER, AMERICAN PROPERTY: A HISTORY OF HOW, WHY, AND WHAT WE OWN (Harv. Univ. Press 2011).

A property interest may be *tangible*—such as money in one's pocket—or *intangible*— such as a copyright or confidential business information, and federal criminal laws that protect property rights may extend to both tangible and intangible property rights. *See, e.g.*, *Carpenter v. United States*, 484 U.S. 19, 25 (1987) (the "intangible nature" of the Wall Street Journal's "confidential business information"—such as its publication schedule and the contents of its upcoming news articles—"does not make it any less 'property' protected by the mail and wire fraud statutes").

There is at least a substantial argument that the term "property" as used in § 666 includes intangible property. *See United States v. Sanderson*, 966 F.2d 184, 188–89 (6th Cir. 1992) (concluding that § 666 "applies where both intangible and tangible property has been stolen" and thus applying § 666 to theft of employee time as well as theft of paint supplies); *United States v. Hultman*, 26 F. App'x 60, 63 (2d Cir. 2001) (citing *Sanderson* with approval for the proposition that a violation of § 666 may be premised on "having employees paid by federally funded organization perform private contract work"); *see also Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020) (noting that § 666 would apply to a scheme that targeted "[a] government's right to its employees time and labor").

62

Connecticut case law recognizes that one may have an intangible property interest if one has an enforceable right to payment of something of value *even if that payment has not yet occurred*. For example, in *Gaynor v. Payne*, 261 Conn. 585 (2002), the Connecticut Supreme Court considered in the inheritance context whether contingent remaindermen have a property interest sufficient to afford them standing to sue for maladministration of the testator's estate. The facts there showed that the testator created a trust that would pay its income to the testator's children during their lives and then pay out the remainder principal to the testator's grandchildren (the remaindermen). Because the trust could not be terminated without the grandchildren's consent and despite the fact that their right to payment was contingent, the court concluded "that the decedent's grandchildren have enforceable rights with regard to their contingent remainder interests in the trust" and that "[t]he contingent remainders held by the decedent's grandchildren therefore are not expectancies but, instead, are presently existing property interests." *Id.* at 593. As the court explained, "[e]nforceability is the dispositive factor in deciding whether a given interest is an expectancy or, instead, a legally cognizable property interest," and the fact that the right was contingent "does not alter the nature of the contingent remainder as an enforceable, presently existing property interest." *Id.* at 593–94.

The Connecticut Supreme Court in *Gaynor* expressly distinguished its prior decision in *Krause v. Krause*, 174 Conn. 361 (1978), a case that the defendants repeatedly cite (but without reckoning with the later decision in *Gaynor*) for the proposition that the members' interest in CMEEC's margin was no more than an expectancy.[197] In *Krause*, the court stated that an "[e]xpectancy is the bare hope of succession to the property of another, such as may be entertained by an heir apparent. Such a hope is inchoate. It has no attribute of property, and the

---

[197] Doc. #583 at 13; Doc. #586 at 15.

interest to which it relates is at the time nonexistent and may never exist." *Id.* at 365. But the critical difference between *Krause* and *Gaynor* is that the plaintiffs in *Gaynor* had an "enforceable" right to their benefits as created under the trust agreement rather than just a "hope" that they might receive a future benefit.

This case is arguably more like *Gaynor* than *Krause*. The Membership Agreement mandates that CMEEC allocate or disburse the margin to the rate stabilization funds of its margin-eligible members like Norwich and Groton. Even though the allocation had not taken place yet as of the date that margin monies were diverted or designated to the contra margin account to pay for trip expenses, the members arguably had an enforceable right—and hence a property interest—in CMEEC's margin under the reasoning of *Gaynor*.

To similar effect, the Connecticut Supreme Court has ruled that a plaintiff had a property right—not a mere expectancy—in the payment of vested pension benefits. *See Krafick v. Krafick*, 234 Conn. 783 (1995). It noted that property rights may be intangible in nature and that the rights to payment of vested pension benefits "do not constitute mere gratuities" but that "the interest in receiving such benefits is contractual in nature" and that "[a]s contractual rights, pension benefits are 'a type of *intangible* property,' and, as such, are encompassed in Black's definition of 'property.'" *Id.* at 794–95.

The *Krafick* decision arguably supports the government's position here. The Membership Agreement creates contractual rights to payment of benefits that arguably give rise to a property interest even prior to the fact of payment.

In response, the defendants could point to Connecticut corporate law decisions that recognize that "the declaration of a dividend payable to the stockholders, who are of record on a named future date, establishes the intent to be that the separation shall not be made *until that*

64

*date*, and those stockholders only vested with the title." *See Union & New Haven Tr. Co. v. Watrous*, 146 A. 727, 729 (Conn. 1929) (emphasis added) (citing *Richter & Co. v. Light*, 97 Conn. 364 (Conn. 1922)). This authority favors the defendants' argument that the recognition of CMEEC margin itself vested CMEEC members with no property interest until the date that the margin was later allocated or disbursed to the rate stabilization fund.

Yet state courts have split on whether a dividend becomes the shareholder's property as of the date that the dividend is declared or as of the date that it is paid as of record. *See Putnam's Estate v. C.I.R.*, 324 U.S. 393, 396 n.3 (1945) (citing cases); *see also* FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 31 ("[E]arnings and profits still in the possession of a corporation belong to the corporation the same as its property generally, and there is nothing due and owing a shareholder as a matter of debt or property *until a dividend is declared* in an appropriate manner.") (emphasis added). And the government's supplemental reply memorandum cites *Sanchez v. Grain Growers Ass'n of Cal.*, 176 Cal. Rptr. 655, 659 (Cal. Ct. App. 3d Dist. 1981), a California case stating that members of an agricultural cooperative have a property interest in undistributed surplus after it has been declared as surplus by the board of directors.[198]

Moreover, the government could sensibly argue that a stronger rule should apply where, as here, the source of the payment arises from no less than a contractual membership agreement that guarantees monthly distribution of margin rather than a unilateral and discretionary declaration of company directors to issue a dividend. The government could argue that the whole purpose of the members' requiring the recognition and designation of margin in the membership agreement was to establish the members' ownership interest and property right to the margin beyond the discretion of the board of directors.

---

[198] Doc. #585 at 5.

Does a legal right to payment qualify as "property" under § 666? I have not found cases that answer that question. But some cases answer "yes" for purposes of the analogous federal mail and wire fraud statutes—18 U.S.C. §§ 1341 and 1343—which similarly require criminal conduct aimed at the deprivation of "property" rights. *See Pasquantino v. United States*, 544 U.S. 349, 355–56 (2005) ("Canada's right to uncollected excise taxes" was "'property' in its hands," because "[t]his right is an entitlement to collect money from petitioners" and "[v]aluable entitlements like these are 'property' as that term ordinarily is employed"); *United States v. Ali*, 620 F.3d 1062, 1067–68 & n.3 (9th Cir. 2010) ("A right to payment is 'money or property' under 18 U.S.C. §§ 1341 and 1343.") (boldface removed).

In short, there is a non-frivolous argument that the members had an intangible property interest in their right to payment of the entire CMEEC margin, not just part of the margin remaining after trip expenses were deducted. Even if the government has not consistently and cogently framed its argument as narrowly as it might have, there was objectively at least a non-frivolous basis in the law and on this record for the government to claim that the trip expenses taken from margin were indeed a misappropriation of property that was owned by CMEEC's members.

The defendants further argue that the monies used by CMEEC to pay for the trip expenses must have been CMEEC property because these monies were stored in CMEEC's operating bank account for which the members were not co-signatories and had no right of access or withdrawal. This argument has superficial appeal but on deeper examination it cuts both ways. That is because the very same bank account that financed the trip expenses also stored monies allocated to the rate stabilization fund which money was plainly the property of CMEEC members.

So it is not dispositive as to the ownership issue simply to point out that the trip expenses were paid from a CMEEC bank account. What is more, if it were solely the bank account source that mattered, then it could be non-frivolously argued that payment from a bank account in which CMEEC commingled its own money with money of its members means that any payment of money from this bank account was payment of money that was owned by CMEEC's members. *Cf. United States v. Silver*, 864 F.3d 102, 115 (2d Cir. 2017) ("Because money is fungible, once funds obtained from illegal activity are combined with funds from lawful activity in a single account, the 'dirty' and 'clean' funds cannot be distinguished from each other.").[199]

All of this is to say that the question of who owns CMEEC margin was at least rationally and fairly debatable. Therefore, the government's claim—as narrowed to the relevant issue of whether Norwich and Groton had a property ownership interest in CMEEC's margin—was not frivolous.

The defendants urge two further grounds to conclude that the government's member-town theory is frivolous. The first is that, because CMEEC margin is defined as revenue *less* expenses and because the monies for the trips at issue constituted expenses, there was no basis for the government to claim that the trip expenses were taken from CMEEC *margin* as opposed to CMEEC *revenue* which was CMEEC property in the first place. The problem with this argument is that CMEEC created the contra margin account. Just the title of this account makes it plausible and hence not frivolous for the government to claim that the trip expenses were taken from CMEEC margin rather than from its revenue. In the words of one of the defense attorneys during opening statements, "[c]ontra margin, as the name suggests, simply means that the retreat expenses were booked against, or contra, the profit, or margin, that CMEEC's members earned

---

[199] The government suggested this possibility in passing during mid-trial arguments of defendants' Rule 29 motion, *see* Tr. 2740–41, but has not pursued or developed the argument in its later briefing.

from selling electricity to nonmembers."[200] Moreover, the government's evidence included a CMEEC business record showing that trip expenses (dubbed "board expenses") were deducted from the members' margin allocations and consistent with the intended operation of the contra margin accounting mechanism.[201]

The defendants next argue that it was frivolous for the government to claim that the members of CMEEC were the member towns rather than what the defendants claimed to be legally distinct municipal electric utilities within each of these towns. Alas, this was an issue that surfaced again and again throughout pre-trial briefing and during the trial itself. The defendants point to the terms of CMEEC's authorization statute which describes its authorized members as municipal electric utilities. In response, the government points to the terms of the Membership Agreement which at times describes the members as the municipalities rather than municipal utilities, and the government relies on the highly intertwined nature of the municipalities and their municipal electric utilities.[202] In light of the government's extensive evidentiary showing with respect to the nature of the relationship between the member towns and their subordinate electric utilities, I am not convinced it was frivolous for the government to argue that CMEEC's members included the member towns and not just the member town utilities.

In summary, there was no error in the introduction of member-town evidence, and the government's member-town theory was not frivolous. Accordingly, I will deny the defendant's motions for new trial to the extent they are premised on the government's member-town theory.

---

[200] Tr. 78.
[201] Gx118; Tr. 4174.
[202] Tr. 4433–34 (summarizing evidence showing relationship between City of Norwich and the Norwich Public Utilities); Doc. #585 at 2–3 (summarizing government's evidence showing relationship between member towns and their electric utilities).

### C.  Motion to disclose grand jury records

The defendants further move to disclose grand jury records including testimony and legal instructions regarding the government's member-town theory.[203] They argue that, in the event that I were to find that the member-town theory was frivolous, grand jury records may show that the government misled the grand jury and could weigh in favor of a dismissal of the indictment.

Rule 6 of the Federal Rules of Criminal Procedure allows a court to authorize disclosure of grand jury records "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). But "[g]rand jury proceedings are presumptively secret, and a defendant seeking the disclosure of grand jury materials bears a heavy burden." *United States v. Schlegel*, 687 F. App'x 26, 30 (2d Cir. 2017). The defendant must present a "particularized need" for the grand jury materials along with "concrete allegations of Government misconduct." *Ibid.*

As I have discussed above, the government did not engage in misconduct by advancing and pursuing its member-town theory. Accordingly, there is no sound reason for me to authorize the disclosure of grand jury records, and I will deny the defendants' motion.

### D.  Renewed motion to dismiss the indictment

The defendants move to dismiss the indictment for reasons previously stated by the defendants and on the ground of alleged prosecutorial misconduct stemming from the member-town theory.[204] To the extent that the defendants in effect seek reconsideration of my prior orders denying their motions to dismiss, I conclude that they have not shown new facts or circumstances to warrant reconsideration. In addition, because I have concluded as discussed

---

[203] Doc. #575.
[204] Doc. #584 (incorporating prior motions to dismiss as filed at Docs. #86, #87, #103, and #329).

above that it was not misconduct for the government to advance and pursue the member-town theory, there are no proper grounds for dismissal of the indictment.

### CONCLUSION

The Court DENIES the defendants' motions for judgment of acquittal (Docs. #439, #466, #551), motions for mistrial and new trial (Docs. #457, #459, #465, #467, #552), motion for disclosure of grand jury records (Doc. #575), and motion to dismiss the indictment (Doc. #584).

It is so ordered. Dated at New Haven this 6th day of January 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge